## 65014. PIERCE v. PACIFIC & SOUTHERN COMPANY, INC. et al.

POPE, Judge.

In early 1979, a police investigation of International Horizons, Inc. was begun seeking information regarding its alleged involvement in drug trafficking and other criminal activity and to ascertain its connection, if any, with the management of "Billy's," a Buckhead night club. This investigation was approved by and funded through a grant to the Organized Crime Prevention Council ("Council"). It was conducted by the Metro Narcotics Squad ("Squad") composed of police officers drawn from various police agencies in the Atlanta area and supervised by Sgt. Korey of the Fulton County Police Department. The strategy in the International Horizons investigation was for certain members of the Squad to frequent "Billy's" during apparently off-duty hours, spending more money than police officers would ordinarily be expected to spend, to give the appearance that they were corrupt in order to gain the confidence of

patrons and employees of "Billy's" so that useful information could be gathered. The investigation began with Squad members Strayhorn and Guy; however, Guy was replaced with the assignment of appellant Pierce of the Cobb County Police Department in June 1979. Until the grant funds were expedited in July 1979, Strayhorn was instructed to use his personal credit card for payment of the bills incurred at "Billy's" for which cash reimbursement would follow from Sgt. Korey.

Because Pierce and Strayhorn were to appear to be corrupt, the Council chose an outside observer from the press, appellee Cairns, to closely monitor the International Horizons investigation so that when it ended, this sole monitor would report that the appearance of corruption had been intended and that the police officers had acted under the authority of the Squad. To that end, Cairns, then a news reporter at WSB Radio, was provided with access to all reports and was briefed on the investigation very frequently. Initially, Strayhorn shared responsibility with Korey for communication with Cairns; however, after repeated disputes arose between Strayhorn and Cairns, regarding personal and professional matters, Cairns was briefed only by Korey. In September 1979 Cairns joined the reporting staff of appellee WXIA-TV. In October 1979 fellow WXIA-TV reporter and appellee Franklin was also fully briefed on the investigation.

During the time period covered by the investigation, on July 15, 1979 an educational drug kit, maintained by the Cobb County Police Department to aid in speeches made to schools and civic groups, was stolen from the trunk of Strayhorn's car while it was parked at "Billy's." Pierce's police identification, handcuffs and guns were also taken. After an immediate investigation of the theft was conducted by the Internal Affairs Division of the Cobb County Police Department, both Strayhorn and Pierce were cleared of any wrongdoing. This investigation included polygraph test results for the police officers showing that both had passed. In order to avoid suspicion which might have jeopardized their undercover work at "Billy's," it was decided that Strayhorn and Pierce would be given fake suspensions. Cairns was aware of and concurred in this action. Reports were made regarding the sham disciplinary action and they were entered in the International Horizons investigation file.

Strayhorn and Pierce had returned to duty with the Cobb County Police Department in September 1979. The International Horizons investigation was drawing to a close near the end of November 1979.

On December 11, 1979 publicity generated by the trial of Billy Watson, owner of "Billy's," brought the names of Pierce and

Strayhorn into prominence in the Atlanta news media. The officers became involved in the trial through Watson's request to them in mid-July 1979 that they falsely testify at his upcoming trial for aggravated assault in support of his assertion of self-defense. Although the officers had not witnessed the incident, they agreed to give such testimony after consulting with and receiving the permission of their superiors and the assistant district attorney. Acting according to their plan, during the trial they informed Watson's attorney that, contrary to their previous statements, they had not witnessed the incident and they would not testify that they had.

A newspaper account of this development was published in the Atlanta Journal on the afternoon of December 11. In addition to the events of the trial, the article included the fact that both officers Strayhorn and Pierce were approached by Watson to give false testimony while they were working an undercover metro narcotics squad investigation at "Billy's" posing as corrupt policemen in order to get close to Watson. Claiming that they had been "scooped" by the newspaper, Franklin showed the article to Cairns. Later that evening on the WXIA-TV 6:00 p.m. newscast, the first of five broadcasts in three days by Cairns and/or Franklin aired reporting the events surrounding, and the effect of the officers' involvement, in the Watson trial. The five newscasts also contained additional statements that Pierce and Strayhorn were then under investigation for the July 15, 1979 theft of the educational drug kit and for possible falsification of credit card receipts. Strayhorn and Pierce made a written demand for retraction on December 12, 1979 after the first two reports were aired. Three more reports followed.

Pierce filed suit against Pacific & Southern Co., Inc., d/b/a WXIA-TV, Cairns and Franklin in five counts alleging defamacast in each of the five broadcasts. At the close of Pierce's evidence, the trial court granted the appellees' motion for directed verdict.

1. "Defamation by telecast is now actionable by law regardless of whether it be libel or slander. [Cits.] In the case of *American Broadcasting &c. v. Simpson,* 106 Ga. App. 230 (1) [(126 SE2d 873) (1962)], Judge Homer C. Eberhardt . . . coined a new word, now in general use, which is quite descriptive of being defamed by television, to wit '*defamacast.*'" *Montgomery v. Pacific & Southern Co.,* 131 Ga. App. 712, 715 (206 SE2d 631) (1974). However, the protection of the state defamation laws was limited by the landmark case of New York Times Co. v. Sullivan, 376 U.S. 254 (84 SC 710, 11 LE2d 686) (1964). "Under the fundamental standard there enunciated, a public official might be allowed the civil remedy of recovery of damages for slander or libel only if he establishes that the utterance was false *and* made

with actual malice, that is, 'with knowledge of its falsity or in reckless disregard of whether it was false or true.' [Cit.] And it is no different whether the complainant be a 'public official' or a 'public figure.' " *Williams v. Trust Co. of Ga.,* 140 Ga. App. 49, 54-5 (230 SE2d 45) (1976).

We hold that the requirement of a showing of actual malice applies in the case sub judice. Under the facts of this case, Pierce is properly classified as a "public official" under the rationale of Coursey v. Greater Niles Township Publishing Corp., 40 Ill. 2d 257, 265 (239 NE2d 837) (1968): "[H]is duties are peculiarly 'governmental' in character and highly charged with the public interest. It is indisputable that law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws."

2. As a public official, in order to recover in an action for defamacast, Pierce must establish that the statements made were false and that they were made with actual malice on the part of the appellees. Appellees contend that Pierce failed to establish these key elements and, thus, the trial court was correct in granting their motion for a directed verdict at the close of Pierce's evidence. "This case was decided in [appellees'] favor on motion for directed verdict. In such cases, all of the evidence and all inferences from the evidence must be construed most favorably toward the party against whom the verdict is directed, which, in this case, is in favor of [Pierce]." *Montgomery v. Pacific & Southern Co.,* supra at 714.

Each of the five broadcasts containing the allegedly defamatory statements was reported within a news story relating the events of the Watson trial. The pertinent portions of each are excerpted below:

(a) 6:00 p.m. Newscast, 12/11/79:

"But last summer, the investigation took a new twist possibly implicating Detectives Strayhorn and Pierce in wrongdoing themselves. July 15th, while the two officers were inside Billy's, a narcotics sample case, full of illegal and expensive drugs used as an educational prop in lectures at schools, was stolen from the trunk of the officers' car, along with their pistols and police identification. At that point, or shortly thereafter, the two officers became the object of

an investigation themselves. The question was and still is, did two police detectives who tried to present themselves as corrupt cops, in fact become corrupt cops?

"That investigation is still continuing. It centers around whether or not the officers were involved in the theft of the narcotics sample case, whether or not they arranged to have it stolen. Sources say a check of the receipts received by the officers during their visits to Billy's are in sequence and may have been falsified."

(b) 11:00 p.m. Newscast, 12/11/79:

"But on July 15th while the officers were in the Club, a narcotic sample case was stolen from the trunk of the officers' car, along with their pistols and I.D. That incident has prompted an investigation of Strayhorn and Pierce. Had they stolen the case? Or had they falsified credit card documents concerning their Club probe?"

(c) 6:00 p.m. Newscast, 12/12/79:

"Yesterday we reported that two undercover detectives involved in the Watson case, Jim Strayhorn and Bob Pierce, were themselves under investigation in connection with the theft of a narcotics display case from their car."

(d) 11:00 p.m. Newscast, 12/12/79:

"Yesterday we reported that the two undercover detectives, Jim Strayhorn and Bob Pierce, are themselves under investigation in connection with the theft of a narcotics display case and for possible falsifying of credit receipts during the period they were working undercover in the club."

(e) 6:00 p.m. Newscast, 12/13/79:

"The [International Horizons strategy] failed and as we have reported, the two detectives are now under investigation for possible involvement in the theft of drugs and possible falsification of credit card receipts during the time they were working undercover."

By the very nature of the action for defamation by broadcast, defamacast, Pierce must first prove that the statements complained of were false when they were made. "A libel must be false as well as malicious." *Jones v. Neighbor Newspaper,* 142 Ga. App. 365, 369 (236 SE2d 23) (1977). See Code Ann. § 105-701 (now OCGA § 51-5-1). Therefore, it follows that the initial inquiry must be whether or not Pierce carried his burden of proof on the issue of falsity. It is clear from the excerpts of the five newscasts that Pierce and Strayhorn were reported as being under investigation for two separate reasons:

(1) the July 15, 1979 theft of the educational drug kit; and (2) falsification of credit card receipts.

Pierce failed to establish the falsity of the statements regarding an investigation of possible credit card receipt falsification. The record contains evidence that prior to December 11, 1979 the Council had instructed Sgt. Korey to investigate suspicious circumstances surrounding the receipts from Strayhorn's credit card used at "Billy's" for purchases made by both officers. Although it was established that the investigation had not been energetically pursued by Sgt. Korey, Strayhorn testified that he had been requested by Korey to turn over the originals of the credit card receipts in November 1979, and that he had refused. This investigation was concluded favorably to Pierce and Strayhorn sometime after the broadcasts; however, the evidence of record supports the veracity of the newscasts at the time they were made regarding the investigation of the officers on possible credit card receipt falsification.

Pierce adduced ample proof to show that he and Strayhorn had, months before the broadcasts, been found by the Internal Affairs division of the Cobb County Police Department to have committed no wrongdoing regarding the theft of the drug kit on July 15, 1979. However, appellees contend that Pierce did not show that no investigation into the theft was ongoing at the time of the broadcasts. In support of this contention, appellees cite an on-camera interview of Assistant Police Chief Lewis Graham of the Fulton County Police Department, the law enforcement agency for the jurisdiction in which the crime occurred. The text of that interview, conducted by appellee Cairns and broadcast on the 6:00 p.m. newscast on 12/12/79, is as follows:

*Asst. Chief Graham:* "You know detectives Strayhorn and Pierce were assigned to us on loan from Cobb County when the theft took place. They were assigned to us on another investigation. We thought that in order to protect the integrity of our investigation that we needed to initiate an investigation into the theft of the drug kit, which we did."

*Tammie Cairns:* "And are those officers under investigation in that?"

*Asst. Chief Graham:* "At this point in time, the only thing I can say is that: No arrests have been made as so far as the person or persons involved in the theft are concerned. So everyone connected with it become [sic] suspect as far as I'm concerned."

At the time of the theft of the drug kit from Strayhorn's car which was used by both officers to travel to "Billy's," the drug kit was in the possession of Pierce and Strayhorn. Because it had been stolen from their possession, both officers were clearly connected with the

theft. The drug kit had been checked out from the Cobb County Police Department for use in a speech and had not been returned by that evening in contravention of departmental rules. The evidence further shows that, upon discovery of the theft, the Fulton County Police Department had begun an investigation. While we note that Graham's confirmation statement was somewhat less than unequivocal, in order to carry the burden of proof on the issue of falsity, Pierce must have adduced affirmative evidence to show that the investigation of the crime by the police agency for the jurisdiction responsible for it had terminated as to Pierce and Strayhorn. During the presentation of his case, this was not done.

Under the New York Times standard it was also incumbent upon Pierce to prove by clear and convincing evidence that the defamatory falsehoods were made with actual malice, " 'that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.' " *Goolsby v. Wilson,* 146 Ga. App. 288, 289 (246 SE2d 371) (1978); *Williams v. Trust Co. of Ga.,* supra at 56. Since the definition of actual malice presupposes a showing that the statements were defamatory, i.e., false, and Pierce did not provide evidence sufficient to prove that falsity, he failed to satisfy the constitutional standard regarding actual malice. " '[A]ctual malice' under the New York Times case . . . was made 'a constitutional issue to be decided initially by the trial judge vis-a-vis motions for summary judgment and directed verdict. . . .' " *Williams v. Trust Co. of Ga.,* supra at 58. Under the circumstances in this case, the trial court was correct in granting appellees' motion for directed verdict.

*Judgment affirmed. Deen, P. J., and Sognier, J., concur.*

DECIDED MARCH 16, 1983 —
REHEARING DENIED MARCH 31, 1983 —

*Adele P. Grubbs,* for appellant.
*James C. Rawls, V. Robert Denham, Jr.,* for appellees.