A03A0841. LAKE PARK POST, INC. et al. v. FARMER.
A03A0842. MOORE v. FARMER.
(590 SE2d 254)

BARNES, Judge.

In these appeals, the Lake Park Post, Inc., its editor and publisher Al Parsons, and its columnist Charles Moore (collectively "the Lake Park Post defendants") challenge a judgment based on a jury verdict for compensatory and punitive damages in favor of Kevin Farmer for $225,000.[1] Farmer, a deputy sheriff, sued the Lake Park Post defendants for libel after the paper published a series of articles, written by Parsons and Moore, that stated that Farmer murdered Willie James Williams by brutally and repeatedly hitting Williams with a flashlight while he was handcuffed and not resisting arrest. The paper published an article stating that "enhanced video footage shows Deputy Kevin Farmer beating Williams with a flashlight." Williams died on September 1, 1998, and the articles on which this case is based were published after August 5, 1999.

Although Farmer demanded a retraction, the Lake Park Post defendants refused to publish one, and continued to publish articles stating that Farmer beat Williams with a flashlight and caused his death. In all, according to Farmer, the Lake Park Post defendants called Farmer a murderer 17 times and reported that he brutally beat Williams with the flashlight 48 times.

The Lake Park Post defendants do not contend that the statements in the articles were true. Instead, the only issue that they argue is that the trial court erred by denying their motions for a directed verdict because Farmer, a public official, failed to prove by clear and convincing evidence that the statements were made with actual malice, i.e., knowing that they were false or with a reckless disregard for their falsity. We disagree and affirm.

1. When reviewing a trial court's denial of a motion for a directed verdict, appellate courts "must review and resolve the evidence and any doubt or ambiguity in favor of the verdict. A directed verdict . . . is not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, *demands* a certain verdict." (Citations and punctuation omitted.) *Southern Store &c. Co. v. Maddox*, 195 Ga. App. 2, 3 (1) (392 SE2d 268) (1990). Further, "[w]e have an independent obligation as an appellate court to examine this record and determine if this verdict and judgment was supported by clear and convincing proof of actual malice. *Bose Corp. v. Consumer's Union*, 466 U. S. 485, 511 (104 SC 1949, 80 LE2d 502) [(1984)]." *Miller v.*

---

[1] The jury assessed compensatory damages of $65,000 and punitive damages of $10,000 against each defendant.

*Woods*, 180 Ga. App. 486, 489 (349 SE2d 505) (1986). Our obligation is "'to make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" (Citations omitted.) *Bose Corp. v. Consumer's Union*, supra, 466 U. S. at 499.

2. With

the United States Supreme Court's decision in *New York Times Co. v. Sullivan*, [376 U. S. 254 (84 SC 710, 11 LE2d 686) (1964),] the law of defamation has undergone substantial changes. [See Restatement (Second) of Torts (1977), Div. 5, Ch. 24-27, special note.] The Restatement now lists four elements in a cause of action for defamation: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm. When, as here, a libel action involves a speech of public concern, a plaintiff must show that the defendant published a defamatory statement about the plaintiff, the defamatory statement was false, the defendant was at fault in publishing it, and the plaintiff suffered actual injury from the statements.

(Punctuation and footnotes omitted.) *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2) (573 SE2d 376) (2002). Further, *New York Times v. Sullivan*, supra, held

that the constitutional guarantees of free speech and free press prohibited a public official from recovering damages for defamatory criticism of his conduct unless the official proves the statement was made with "actual malice." This standard requires the public official to prove that the defendant had knowledge that the statement was false or was made with reckless disregard of whether it was true or false.

(Punctuation and footnotes omitted.) *Mathis v. Cannon*, supra, 276 Ga. at 21 (3); *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 816 (3) (555 SE2d 175) (2001). Thus, a public official "may recover on his libel claim, so long as he demonstrates, by clear and convincing evidence, that the statements complained of were made with actual malice." *Davis v. Shavers*, 269 Ga. 75, 76 (495 SE2d 23) (1998).

All parties agree that, as a deputy sheriff, Farmer is a public official who must meet the actual malice test. *Sparks v. Thurmond*, 171

Ga. App. 138, 141 (1) (319 SE2d 46) (1984); *Pierce v. Pacific & Southern Co.*, 166 Ga. App. 113, 116 (303 SE2d 316) (1983). See, however, *Ellerbee v. Mills*, 262 Ga. 516, 517 (1) (422 SE2d 539) (1992), holding that a school principal was not a public official because principals generally "are removed from the general conduct of government, and are not policymakers at the level intended by the *New York Times* designation of public official."

In the context of libel actions brought by public officials,

> [r]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *St. Amant v. Thompson*, 390 U. S. 727, 731 (88 SC 1323, 20 LE2d 262, 267) (1968). Stated differently, it has been held that "reckless disregard" is established by evidence showing that the defendant acted with a "high degree of awareness of probable falsity." *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (94 SC 2997, 41 LE2d 789) (1974).

(Punctuation omitted.) *Sparks v. Thurmond*, supra, 171 Ga. App. at 140 (1). "Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. Also, failure to investigate does not in itself establish bad faith." (Citation and punctuation omitted.) *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 55 (III) (230 SE2d 45) (1976). Constitutional malice concerns "awareness of actual or probable falsity, or his reckless disregard for their falsity." Id. at 56.

> The defamatory statement may be false but it is still not actionable unless it was uttered with knowledge of its falsity or in reckless disregard for the truth. Truth or falsity is not the constitutional test; the statements must be published with actual knowledge of their falsity or with reckless disregard for their falsity. Even if the story is indeed false, plaintiff must meet that standard.

(Citations and punctuation omitted.) Id. at 62 (IV). Also, in cases concerning libel of public officials, actual malice

> does not necessarily extend to ill will, hatred or actions calculated to injure for this may run afoul of the freedom of speech protected by the First Amendment. *Garrison v. Louisiana*, 379 U. S. 64, 72 (85 SC 209, 13 LE2d 125) [(1964)]. Moreover, knowledge of falsity or reckless disregard of the

truth may not be derived solely from the language of the publication itself. *Williams v. Trust Co. of Ga.*, supra at pp. 55-56. Constitutional malice does not involve the motives of the publisher but is based upon his awareness of actual or probable falsity or his reckless disregard for possible falsity. Reckless disregard requires clear and convincing proof that [the Lake Park Post defendants were] aware of the likelihood [they were] circulating false information. *New York Times Co. v. Sullivan*, [supra]. Thus it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that [the Lake Park Post defendants] in fact entertained serious doubts as to the truth of [their] statements in the [paper]. *Williams v. Trust Co. of Ga.*, supra at p. 55. . . . Such actual malice may not be presumed but is subject to being proven with convincing clarity. *New York Times Co. v. Sullivan*, supra at p. 284.

*Miller v. Woods*, supra, 180 Ga. App. at 488. "Absent an admission by the defendant that he knew his material was false or that he doubted its truth, a public figure must rely upon circumstantial evidence to prove his case. [Cits.]" *News Publishing Co. v. DeBerry*, 171 Ga. App. 787 (1) (321 SE2d 112) (1984).

Applying these principles, we are satisfied that Farmer met his burden of proving by clear and convincing evidence that the Lake Park Post defendants acted with constitutional malice when publishing these articles. Even though Parsons and Moore testified that they believed the statements in the articles were true, the evidence plainly demonstrates that they had no reason for doing so. The Lake Park Post defendants repeatedly labeled Farmer as a murderer and Moore said that he "lynched" Williams when no proof existed to support either version. More significantly, Parsons and Moore had available to them abundant evidence that these claims were false.

Viewed in support of the verdict, the evidence shows that Farmer stopped Williams for driving on the wrong side of the road at 2:00 a.m. on September 8, 1998. After first disobeying Farmer's command to stop his car and then refusing to leave his car, Williams then did so. He was unable to produce his driver's license and insurance card, and then gave Farmer a name and date of birth which did not match the computer records. These factors, combined with Williams's driving, his slurred speech, and the strong smell of alcohol on his person, caused Farmer to arrest Williams.

Williams, however, resisted Farmer's efforts. Although told not

to, he put his hands in his pockets and resisted Farmer when he put handcuffs on Williams. After Williams was handcuffed, Farmer searched Williams and found a prisoner identification card and a pocketknife. When information from the prisoner identification card was checked on the computer, the information showed that a warrant for Williams's arrest existed.

Williams then physically resisted Farmer's efforts to put him in the back of the patrol car. During this resistance, Williams fell on the ground. After Farmer helped Williams to his feet, Williams still refused to enter the patrol car and, according to Farmer, began pulling, pushing, and kicking at Farmer.[2] At one point Williams escaped Farmer's control, and then Farmer executed a maneuver known as an "arm-bar take down" to regain control of Williams.

Farmer denied hitting Williams with anything, particularly with his flashlight. A video of the event, taken by the camera in the patrol car of a backup officer who responded, shows that Farmer's flashlight was attached to his police belt during the incident. All the eyewitnesses to the event, two of whom were called as defense witnesses, also testified that Farmer never hit Williams with anything. The whole incident was recorded on the videos taken by cameras in the patrol cars of the two deputies and played to the jury.

Another defense witness, Williams's girlfriend, testified, however, that Williams told her after his arrest that Farmer hit him, and another witness testified that she concluded from the video she saw that Farmer hit Williams. Neither of these witnesses was an eyewitness to the event.

A Georgia Bureau of Investigation medical examiner, after performing an autopsy, concluded in his report that Williams died from blunt force trauma to the head that was received when Farmer took him to the ground. In December 1998, the examiner testified at the coroner's inquest that Williams died from injuries sustained in the fall and not from being beaten. The medical examiner also reported and testified at the coroner's inquest that Williams's chronic alcoholism was a significant contributing factor to his death because damage to the liver affected his blood's capacity to clot and atrophy of the brain caused the brain to twist around in his skull and cause the bleeding.

The medical examiner testified that without these contributing factors another person falling as Williams did would not have died. Parsons attended the coroner's inquest and heard this witness so testify before writing the articles at issue.

---

[2] Eyewitnesses to the incident, however, testified that they did not see Williams kick at or strike Farmer.

Shortly after Williams's death, the GBI investigated the incident and interviewed over 90 witnesses. The GBI investigation found no evidence that Farmer hit Williams with a flashlight or anything else. This report was made available to the district attorney who presented the case at the coroner's inquest. The coroner's inquest called 30 witnesses and concluded that Williams's death was accidental. The case was also presented to a grand jury which refused to indict Farmer. All of this information was available to the Lake Park Post defendants *before* they published the articles that gave rise to this litigation.

The Lake Park Post defendants contend that the Williamses' family attorney showing the videos of the incident is what broke the story they reported. The first showing was on August 26, 1999, to about 200 people at the public library. The attorney had been retained by the Williams family to pursue a wrongful death action on their behalf. The video showed Farmer and Williams struggling, and the audience, including Parsons, decided that they saw Farmer beating Williams with a flashlight. The video was shown a second time at a church on September 5 and, according to Parsons, again showed Williams being beaten with a flashlight.

Parsons testified that his articles were based on hearing sworn testimony at the coroner's inquest, seeing the videotapes from the deputies' patrol cars, reviewing the GBI report, reading the medical examiner's report, and interviewing four witnesses. These four witnesses, however, were not eyewitnesses to the event.

Parsons also spoke with a man who saw Williams in jail shortly before his death. According to this person, Williams could hardly speak because his lips were so swollen, his arm was in a sling, and he had a gauze bandage on his jaw. Williams allegedly told this person that, "They pushed me down, they beat me up, they did this to me."

Farmer's claims against Moore are based on two editorial columns Moore wrote about the incident. The first, on August 5, 1999, entitled "It's a Strange Land Indeed," stated that "Williams died of a fatal head injury after he was beaten while in the custody of the Lowndes County Sheriff's Department." The column stated that, according to others, a video showed Williams actually being beaten. The column then went on to connect this incident to one 80 years before in which a black woman had been lynched by a white mob. Moore stated that Williams's lynching "was conducted by a mob wearing badges." Moore's second column, dated October 7, 1999, was entitled "We've Got to Stop the Good Old Boy Network." He stated that Williams "died while in the sheriff's custody a year ago, after being beaten by sheriff's deputies."

Moore testified unequivocally that he believed his columns were true. He also testified that he had read portions of the coroner's

report and relied on information from Parsons. He testified that he thought the incident was comparable with the earlier lynching because in both cases the establishment refused to address the concerns of minorities. He further testified that he used the term "lynching" as "hyperbole, . . . a figure of speech."

When he wrote his first column on August 5, 1999, that Williams was murdered with a flashlight, however, Moore had not seen the videos. He did not attend the coroner's inquest or read its complete transcript, did not review the GBI report, or interview any witnesses. After this suit was filed, Moore interviewed one witness, and although he interviewed another witness earlier, he testified that he did not rely on this witness in his columns.

Defendants in these actions,

> cannot, however, automatically insure a favorable verdict by testifying that [they] published with a belief that the statements were true. Recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. When an article is not in the category of "hot news," that is, information that must be printed immediately or it will lose its newsworthy value, actual malice may be inferred when the investigation for a story was grossly inadequate in the circumstances.

(Citations and punctuation omitted.) *News Publishing Co. v. DeBerry*, supra, 171 Ga. App. at 788 (1).

We are satisfied that the evidence fully supports the jury's conclusion that the Lake Park Post defendants published the articles in question with constitutional malice. *News Publishing Co. v. DeBerry*, supra, 171 Ga. App. at 789. The Lake Park Post defendants' malice is revealed both by what they published and what they did not publish. Anyone reading their articles would not know that the eyewitnesses, the coroner's inquest, the medical examiner's report, and the GBI report contradicted the allegations the Lake Park Post defendants made. In particular, no reader of the Post would know that the medical examiner attributed Williams's death to what otherwise would have been a minor injury except for Williams's brain atrophy and liver damage caused by his chronic alcoholism.

We conclude that the defendants so doubted the truthfulness of their articles that they refused to print any information that contradicted their version of the events. Under these circumstances, the judgment of the trial court is affirmed.

*Judgments affirmed. Andrews, P. J., and Adams, J., concur.*

DECIDED NOVEMBER 24, 2003 — 

*J. Converse Bright*, for appellants (case no. A03A0841).
*Cork & Cork, Patrick C. Cork*, for appellant (case no. A03A0842).
*Balch & Bingham, Michael J. Bowers, Christopher S. Anulewicz, Langdale, Vallotton & Linahan, William P. Langdale, Jr.*, for appellee.