**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 27, 2017**

# In the Court of Appeals of Georgia

A17A0883. LADNER v. NEW WORLD COMMUNICATIONS OF
    ATLANTA, INC.

MCMILLIAN, Judge.

Shane Ladner appeals from the trial court's grant of summary judgment to New World Communications of Atlanta, Inc. d/b/a Fox 5 Atlanta ("Fox 5") on his defamation claim arising out of a series of televised news reports by Fox 5 reporter Randy Travis ("Travis").

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." *Elder v. Hayes*, 337 Ga. App. 826, 827 (788 SE2d 915) (2016). So viewed, the evidence in this case shows that in 2012,

Ladner, then a police officer for the City of Holly Springs, Georgia, completed an application to participate in "Hunt for Heroes," an annual event in Midland, Texas to honor wounded veterans hosted by Show of Support, a non-profit organization. As part of the application, Ladner wrote a biographical summary (the "bio"), which he knew was going to be published. The bio stated that Ladner joined the Army in 1989 and was assigned to Panama in December of that year, where he received a shrapnel wound from an exploded grenade during Operation Just Cause. Ladner did not claim in his bio that he had received the Purple Heart, although he stated that he had received the Medal of Valor.

Based on his application, Ladner was selected to participate in the Hunt for Heroes event, which included a hunting trip, parade, and banquet. Ladner's bio, along with those of the other participants, was featured in the San Angelo Standard-Times in Texas. The Holly Springs Police Department ("HSPD") issued a news release and Twitter posts about Ladner's participation in the event, and a local Georgia paper reported that he had been selected for a charity-sponsored "all-expense paid whitetail deer hunt," describing Ladner as "medically retired from the Army after being wounded twice – a selfless act that earned him awards for valor."

2

On November 15, 2012, during the Hunt for Heroes parade, the float carrying Ladner and his wife Meg Ladner ("Meg") was involved in a collision with a train. Tragically, four veterans who were riding on the float were killed and a number of participants suffered serious injury, including Meg, who eventually had her left leg amputated. The incident received national media coverage, and the circumstances surrounding the Ladners' injuries, particularly Meg's, were widely reported. The circumstances of the accident and the Ladners' involvement were published by the media in Georgia and Wisconsin, where Meg's parents lived. A few days after the accident, Ladner issued a public statement, which was reported in a number of outlets including the New York Times, the Los Angeles Times, and a local Texas news station, expressing appreciation for the support the Ladners had received from the Midland, Texas community and thanking the volunteer group that had sponsored the event.

After the Ladners returned home to Georgia, local businesses donated meals and gift cards and offered labor and supplies to modify their home to accommodate Meg's injuries. Numerous fundraisers were held on their behalf, some of which Ladner attended, and these events were publicized in local news and on social media. Most of these articles mentioned that the Ladners were injured at a wounded veteran's event and/or discussed Ladner's military service. Several articles and a number of fundraising

3

flyers described Ladner as the recipient of one or more Purple Hearts. Ladner gave at least six interviews or statements to local media about the accident and his wife's condition, including a press conference held by the HSPD, and the statements were reported in articles listing ongoing fundraising efforts. Ladner's quoted comments addressed his interactions with Meg during the accident, her medical progress, their need for housing and equipment to accommodate her condition, and his appreciation for the community's support. However, the record contains no recorded statements by Ladner regarding his military service or commendations in these interviews.

During Meg's recovery from the accident, tensions grew between Ladner and some of Meg's relatives. The strain led these relatives to file a Freedom of Information Act (FOIA) request and hire a private investigator. One of Meg's aunts subsequently wrote a letter to the Georgia Attorney General asserting that Ladner had misrepresented his military service and had not been awarded a Purple Heart as he had claimed. An investigator from one Atlanta television station later contacted Meg's cousin regarding Ladner and his use of the state-issued Purple Heart license plate. Meg's cousin, in turn, contacted Travis at Fox 5, a different station, about the situation.

Fox 5 subsequently broadcast a series of five investigative reports by Travis about Ladner during its evening newscasts on April 29, June 12, June 14, June 19, and

4

November 22, 2013. Fox 5 also published five articles involving Ladner on its website on the same dates as the broadcasts. The broadcasts and articles asserted that Ladner had lied about his military record and implied that he may have done so to earn a free hunting trip to Texas, to obtain a free Purple Heart license plate, and to avoid paying ad valorem taxes on his vehicle. The broadcasts also suggested that if Ladner had not misrepresented his record, Meg and he would not have been on the parade float, and they would not have suffered their injuries.

During the broadcasts, Travis presented military and school records that he asserted showed that Ladner's claim that he was injured during the 1989 Panamanian invasion was false, noting that the records indicated that he had not joined the army until 1990 and that he was, in fact, still attending high school during the Panamanian operation. Travis also reported that Ladner's 1994 and 2002 DD-214 discharge forms from his military file, which Ladner had signed, made no mention of a Purple Heart.

Prior to the first broadcast, Ladner issued a statement through his attorney addressing his military record and attaching a DD-214 form from 2004 that reflected that Ladner had received a Purple Heart and other commendations (the "2004 DD-214"). Travis reported on this statement and the 2004 DD-214 in the first Fox 5 broadcast on April 29, and the statement was printed in full in the accompanying website article. The

5

statement explained that Ladner was ordered by his superiors to lie about the circumstances surrounding his injuries because he actually was wounded while on patrol during "sensitive" drug interdiction tactics in Central America. However, Ladner declined to speak with Travis directly when the reporter confronted him on camera.

Although Travis reported on Ladner's response, he also countered it by noting that the copy of Ladner's military record that he inspected did not contain a copy of the 2004 DD-214 and contained no orders that usually accompany a Purple Heart. Travis's reporting of his findings included strong declarations such as "Shane Ladner had no business being on the float with other war heroes;" "the Army says [Ladner's statement about receiving a Purple Heart is] just not true;" "the Army told us Ladner has no Purple Heart;" Ladner was relying "on a document the Army says does not exist;" and "the Army says Ladner never received a Purple Heart."[1]

Approximately six weeks after the first FOX 5 broadcast on April 29, 2013, Cherokee County issued criminal charges against Ladner. The indictment, as amended, asserted seven counts of making a false statement in connection with his application for the Purple Heart recipient license plate and in interviews with police. Those charges

---

[1] Additional facts will be cited as necessary to address Ladner's arguments on appeal.

remained pending at the time the trial court issued its ruling on the motion for summary judgment.

Ladner filed this defamation action on April 4, 2014, and following discovery, Fox 5 moved for summary judgment.[2] The motion asserted that Ladner qualified as a limited purpose public figure requiring that he prove actual malice to support his defamation claim, he could not prove such malice, the news reports were privileged reports about government proceedings and records, the challenged statements were substantially true and cannot be proven false, and the reports contained constitutionally protected opinion. The trial court granted the motion for summary judgment, finding that Ladner was an involuntary/limited purpose public figure and that he could not prove the requisite actual malice. This appeal followed.

1. Ladner first asserts that the trial court erred in finding that he was a limited purpose or involuntary public figure and that, instead, he should be considered a private person. "This is a critically important issue, because in order for a public figure to recover in a suit for defamation, there must be proof by clear and convincing evidence of actual malice on the part of the defendant. Plaintiffs who are private persons must

[2] This Court previously denied Fox 5's application for interlocutory appeal of the trial court's denial of its motion to dismiss Ladner's claim.

7

only prove that the defendant acted with ordinary negligence." (Citation and punctuation omitted.) *Riddle v. Golden Isle Broadcasting*, 275 Ga. App. 701, 703 (1) (621 SE2d 822) (2005).

The issue of "whether a person is a public figure is a question of law that requires the court to review the nature and extent of the individual's participation in the specific controversy that gave rise to the alleged defamation." (Citation and punctuation omitted.) *Cottrell v. Smith*, 299 Ga. 517, 525 (788 SE2d 772) (2016). See also *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (V) (94 SCt 2997, 41 LE2d 789) (1974).

> A three-part analysis is used to determine whether an individual is a limited-purpose public figure. Under this analysis, a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy.

(Citation and punctuation omitted.) *Cottrell*, 299 Ga. at 525 (II) (a). See also *Rosanova v. Playboy Enterprises*, 411 FSupp. 440, 443 (III) (S.D. Ga. 1976) ("Defining public figures is much like trying to nail a jellyfish to the wall.").

Applying this analysis to the facts of this case, we find that Ladner was a limited-purpose public figure and that he voluntarily assumed that role.

8

(a) *Public controversy* – The first step in our analysis requires identification of a public controversy, which "must be more than merely newsworthy." (Citation and punctuation omitted.) *Riddle*, 275 Ga. App. at 705 (1) (b). See also *Silvester v. American Broadcasting Cos.*, 839 F2d 1491, 1494 (11th Cir.1988). Rather,

> [i]f it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern. In short, if the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

(Citation and punctuation omitted.) *Gettner v. Fitzgerald*, 297 Ga. App. 258, 263 (677 SE2d 149) (2009). Moreover, courts must look only to those controversies that already existed in the public arena before the alleged defamation. *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 817 (3) (a) (555 SE2d 175) (2001).

Despite Ladner's assertion to the contrary, the trial court did identify a public controversy in this case, defining it as "stolen valor" and the public's interest in "the award of the Purple Heart and whether the Plaintiff is a true recipient."[3] Although

---

[3] The trial court cited the United States Supreme Court's acknowledgment that the government and other medal holders have a strong interest in preserving the integrity of military awards. The Supreme Court noted that "it insults [the latter's] bravery and high principles when falsehood puts them in the unworthy company of a pretender." *United States v. Alvarez*, 567 U.S. 709, 726 (132 SCt 2537, 183 LE2d

9

Ladner asserts on appeal that no public controversy regarding his military valor existed until Fox 5 created one, the record demonstrates that the issue of Ladner's military service and commendations gained wide publicity because he and his wife were injured in a fatal train collision at a public event to honor wounded servicemen. The circumstances of this collision led to investigations by federal, local, and private entities, and these investigations were reported by the national, Texas, and Georgia media. The victims' status as wounded veterans (and their spouses) heightened the public debate surrounding the event. We find, therefore, that these circumstances qualified as a public controversy. See *Dameron v. Washington Magazine, Inc.*, 779 F2d 736, 742 (III) (D.C. Cir. 1985) (finding that fatal airplane crash and ensuing investigation into its causes created a public controversy).

In turn, this controversy generated public sympathy and attention that resulted in numerous fundraising efforts on the Ladners' behalf in Georgia. These efforts cannot be divorced from the accident itself as they were a direct outgrowth of the publicity surrounding the collision. The public solicitations often cited Ladner's participation in the Hunt for Heroes parade and sometimes asserted that he had been awarded one or

574) (2012) (discussing Congressional Medal of Honor).

even two Purple Hearts or other commendations.[4] This publicity spurred members of the public and local businesses to provide financial and other support. Therefore, any information about, and especially information casting doubt on, Ladner's narrative of his military service could have had significant ramifications for individuals who participated in these fundraising efforts.

Accordingly, we define the public controversy in this case as the accident itself, including the investigations and the ensuing public fundraising efforts based, in no small part, on the circumstances of that accident and Ladner's prior military service.

(b) *Ladner's involvement* – As the United States Supreme Court has explained, status as a public figure can be attained "by position alone" or "by . . . purposeful activity amounting to a thrusting of [one's] personality into the vortex of an important public controversy." (Citation and punctuation omitted.) *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155 (87 SCt 1975, 18 LE2d 1094) (1967). "In either event, [public figures] invite attention and comment." *Gertz*, 418 U.S. at 345. The Court has noted that such persons "command[] sufficient continuing public interest and [have] sufficient

---

[4] That this was the public perception of Ladner's narrative is exemplified by an interview in November 2012 by Fox 5 of an individual identified as a "friend," who noted that it was "[m]ind-boggling that he would be wounded in Panama and then go to an event honoring him for his service in the military and then be injured and his wife injured."

access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory statements." (Citation and punctuation omitted.) *Butts*, 388 U.S. at 155. Therefore, as the Georgia courts have explained, "[a] plaintiff in a libel case must be deemed a public figure if he purposefully tries to influence the outcome of a public controversy or, because of his position in the controversy, could realistically be expected to have an impact on its resolution." *Jewell*, 251 Ga. App. at 817 (3) (b) (a plaintiff's involvement in the public controversy must be more than merely tangential).

Moreover, "[w]hether a person has voluntarily injected himself into a public controversy in order to have an impact on its outcome cannot be determined solely by reference to the actor's subjective motives." *Jewell*, 251 Ga. App. at 819 (3) (b). See also *Wauldbaum v. Fairchild Publications, Inc.*, 627 F2d 1287, 1298 (III) (D.C. Cir. 1980). Rather, "[t]he court must ask whether a reasonable person would have concluded that [the plaintiff] would play or was seeking to play a major role in determining the outcome of the controversy." *Jewell*, 251 Ga. App. at 819 (3) (b). See also *Wauldbaum*, 627 F2d at 1293 (III) ("[A] court analyzing whether a given plaintiff is a public figure must look at the facts, taken as a whole, through the eyes of a reasonable person."). "In examining the nature and extent of [the plaintiff's] participation in the [public

12

controversy], the court can look to [the plaintiff's] past conduct, the extent of press coverage, and the public reaction to his conduct and statements." *Jewell*, 251 Ga. App. at 817 (3) (b). "The court must examine these factors as they existed before the alleged defamation was published." Id.

Here, Ladner voluntarily sought public recognition for his military service by applying to participate in the Hunt for Heroes event; writing a bio that portrayed his service, which he knew would be published; and riding on a parade float that bore his name as one of the wounded veterans. This activity placed the subject of his military service before the public, inviting attention and comment. See *Holt v. Cox Enterprises*, 590 FSupp. 408, 411-12 (N.D.Ga 1984) (As a member of a college football team, plaintiff voluntarily played before thousands of spectators and "necessarily assumed the risk that these persons would comment on the manner in which he performed."). The publicity preceding the event was not confined to Texas, as the HSPD publicly announced Ladner's participation in the wounded veterans' event on Twitter and in the local press.

Although Ladner could not have anticipated that the accident would occur, thrusting the event into the national spotlight, he nevertheless took action that raised his public profile in its aftermath. Within days of the accident, he issued a public statement

of appreciation for the Midland community and the Show of Support charity, which was picked up by the national media. And in or around November 2012, the Ladners hired counsel to file a lawsuit in connection with the accident, and their attorneys issued public statements on their behalf opining on the causes behind the accident and asserting negligence on the part of the railroad.

The circumstances of the accident and the surrounding publicity generated strong public interest in the Ladners in Georgia, leading to multiple fundraising efforts on their behalf. Ladner gave interviews to the local media throughout this period, and the resulting coverage often reported information about his military service and commendations. He also appeared at fundraising events that touted his military accomplishments. For example, a local television station reported that both Ladners appeared and spoke at an event on February 24, 2013, at a Marietta restaurant, and the flyer for that event represented that Ladner was a two-time Purple Heart recipient. Although Ladner himself may not have publicly addressed his military service or the Purple Heart in these interviews and appearances, he nevertheless tacitly supported other's narratives by seeking and accepting the benefits flowing from the public goodwill and sympathy they engendered. Moreover, Ladner continued to display the Purple Heart recipient license plate on his vehicle after gaining such a public profile.

14

We find that by his conduct, Ladner voluntarily injected himself into the public controversy surrounding the accident and its aftermath, including the investigation behind the causes of the accident and the public fundraising efforts centered around it. This conduct could reasonably be expected to have influenced the public debate on these issues. See *Mathis v. Cannon*, 276 Ga. 16, 23-24 (573 SE2d 376) (2002) (director of solid waste management authority, who gave no public statements, nevertheless was a limited public figure based on his role in the underlying events); *Atlanta Humane Society v. Mills*, 274 Ga. App. 159, 164 (2) (b) (618 SE2d 18) (2005) ("[E]ven a single interview given to the media may be sufficient to establish a plaintiff as a limited-purpose public figure."); *Jewell*, 251 Ga. App. at 819 (3) (b) (finding plaintiff was public figure where he was "initially drawn into the controversy unwillingly and thereafter assumed a prominent position as to its outcome"); *Byers v. Southeastern Newspaper Corp.*, 161 Ga. App. 717, 721 (288 SE2d 698) (1982) ("While appellant may not have voluntarily injected himself in the controversy over whether or not [his job] should be abolished, it is clear that appellant was drawn into this controversy by the announcement that the position would be abolished. After having been so drawn, appellant thrust himself into the vortex of this controversy in an attempt to influence others and, thus, invited attention and comment.").

(c) *Alleged Defamation*. An allegedly defamatory publication "is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff." *Jones v. Albany Herald Publishing Co.*, 290 Ga. App. 126, 131 (1) (c) (658 SE2d 876) (2008). Here, the alleged defamation asserted that Ladner was unqualified to have participated in the Hunt for Heroes in the first place and that he had misrepresented the very military service upon which the fundraising activities were based; therefore, it was undoubtedly germane to his participation in the public controversy in this case.

2. Because Ladner was a limited purpose public figure, he must establish that Travis acted with actual malice in his reporting for Fox 5 in order to proceed with his claim. The burden of proof for such a showing is "extremely high," requiring clear and convincing evidence. *Cottrell*, 299 Ga. at 525. "Actual malice in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity." Id. Therefore, "[w]hat is required is 'subjective awareness of probable falsity.'" (Citation omitted.) *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 559 (610 SE2d 92) (2005). In this context,

[r]eckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

(Citation and punctuation omitted.) *Cottrell*, 299 Ga. at 525-26.

Although Ladner bears the burden of proof at trial, on summary judgment, the defendant in a defamation case "must negate the plaintiff's claim of actual malice by establishing that it lacked knowledge that the defamatory matter was false or did not publish it with reckless disregard as to whether it was false or not." *Torrance v. Morris Publishing Group, LLC*, 289 Ga. App. 136, 138 (656 SE2d 152) (2007). However, once a defendant carries this burden, it becomes the duty of the defamation plaintiff "to come forward with evidence of malice so as to create a jury issue on this claim." (Citation and punctuation omitted.) Id at 139.

In this case, the questions regarding Ladner's claimed military record did not originate with Travis. His wife's aunt had previously contacted the attorney general and at least one other media outlet was investigating the matter. The record demonstrates that after Travis was contacted by Meg Ladner's cousin, he conducted an independent

17

investigation into the matter, which included reviewing Ladner's Hunt for Heroes bio; making open records requests to obtain Ladner's military and employment records; obtaining and reviewing the two DD-214 forms from Ladner's tours of duty, neither of which indicated that he had been awarded a Purple Heart; locating Ladner's high school records and senior yearbook; examining the 2004 DD-214 later provided by Ladner, which contained numerous awards and commendations, including the Purple Heart, not listed on the earlier forms; speaking with military experts, who raised questions as to the 2004 DD-214's authenticity; and contacting the National Personnel Records Center, U.S. Army Personnel Office, Fort Benning, and the Georgia Department of Veterans Services, which each reported that they had no record that Ladner had received the Purple Heart.

Travis's review of the military and educational records indicated that Ladner had never served in Panama and, in fact, did not begin serving in the Army until 1990 after the Panama operation had ended. When presented with this information, Ladner first misrepresented that he had graduated high school early and the yearbook just kept his picture with his class. However, when confronted with his high school transcript showing that he was taking high school classes in December 1989, Ladner admitted that he had lied about serving in Panama. Ladner then furnished a copy of the 2004 DD-214,

which had not surfaced in Travis's inquiries from official sources. Although his attorney promised to provide Travis with Ladner's signed authorization to allow Travis to obtain his military records online, such authorization was not forthcoming, either before or after the initial broadcast.

Following his investigation, Travis concluded that Ladner's 2004 DD-214 was false and that Ladner had not, in fact, been awarded the Purple Heart. In his deposition he cited a number of factors that led to these conclusions, including, inter alia: (1) the absence of the Purple Heart in either of the two earlier DD-214 forms; (2) its absence in the personnel records at the official sources Travis had contacted; (3) the 2004 DD-214 form's inclusion of 15 additional awards, including the Purple Heart, that did not appear on the earlier forms; (4) expert opinion indicating that it would have been difficult for Ladner to have accumulated such awards in the intervening period between the DD-214s; (4) Ladner's initial false assertion that he had graduated early from high school as proof that he was in Panama; and (5) his later admission, when confronted with evidence showing otherwise, that his public claim about serving in Panama was not true.

Notably, Travis also provided Ladner an opportunity to respond to his findings and reported his response. While he often disputed Ladner's assertions, Travis showed

a picture of the 2004 DD-214 in the initial broadcast, highlighting its reference to the Purple Heart. He also repeatedly reported Ladner's attorney's statement regarding the drug interdiction mission in the broadcasts and published the statement in full online. In subsequent broadcasts, which occurred after Ladner's arrest and showed an officer with the Cherokee County Sheriff's Department stating that "there simply is absolutely no record of him receiving a Purple Heart ever from the U.S. Army," Travis again reported Ladner's attorney's explanation for Ladner's misrepresentation about Panama. In later broadcasts, Travis quoted Ladner's counsel's statement that Ladner's arrest "serves no purpose other than to continue to traumatize Shane and Meg Ladner, both of whom are still recovering from last year's train accident. When all of the information comes to light, plenty of people will owe Shane an apology." In the fourth broadcast, Travis reported that Ladner's attorney had presented new paperwork that the attorney claimed proved Ladner had a Purple Heart. Although Travis questioned whether the new documentation provided such proof, he interviewed the attorney on camera regarding Shane's version of events. Travis also reported that the attorney had indicated that he had an expert who would testify that the 2004 DD-214 had not been altered. In the final broadcast in November 2013, he reported that "Ladner and his attorneys insist the Army is to blame for losing paperwork that proves a Purple Heart exists."

20

We find that this and other evidence in the record satisfied Fox 5's burden to point to evidence negating Ladner's claim of actual malice. The evidence shows no knowledge on the part of Fox 5 or Travis that his reports were false; to the contrary, Travis asserted that he believed at the time and continued to believe they were accurate. Moreover, the extent of Travis's investigation and his reporting of Ladner's explanations for any discrepancies in his record demonstrate that they did not recklessly disregard whether the reports were false. See *Stange v. Cox Enterprises, Inc.*, 211 Ga. App. 731, 733 (2) (440 SE2d 503) (1994) (steps reporter undertook to investigate matter corroborated his assertion of good faith and belief in the truth of his statements).

We also find that Ladner has failed to carry his burden of presenting evidence to create a jury question on the issue of actual malice. Ladner argues that Travis's timing in presenting the story was rushed and that he should have investigated further before broadcasting his report. However, the "failure to investigate fully or to the degree desired by the plaintiff does not evince actionable reckless disregard." (Citation and punctuation omitted.) *Torrance*, 289 Ga. App. at 140. See also *Jones*, 290 Ga. App. at 133 (2).[5] This principle is true even though Ladner notes that several military men

---

[5] Cf. *News Publishing Co. v. DeBerry*, 171 Ga. App. 787, 788 (321 SE2d 112) (1984) (when article not "hot news," actual malice may be inferred when investigation "was *grossly inadequate* in the circumstances") (citation and

21

opined that Travis did not have enough evidence to show that Ladner had no Purple Heart , because such differences in opinion do not amount to actual malice. "[E]rrors of fact caused by negligence or by adoption of one of a number of possible interpretations do not show actual malice." *Torrance*, 289 Ga. App. at 140.

Ladner also points to internal e-mails from Travis indicating that he would have liked to have had seen a "real" DD-214 form from Ft. Benning and that he questioned how a person could fake copies of a DD-214 form. Although Ladner asserts that these e-mails showed that Travis doubted the truth of his news reports, viewing these comments in context demonstrates that, to the contrary, both Travis and his correspondent believed the 2004 DD-214 form was not authentic and discussed various ways it could have been falsified. Although Travis indicated that he wanted to have the "real" DD-214, this statement was in the context of longer discussion of how Ladner's copy showed earmarks indicating it was not authentic. Further, although Ladner contends that Travis's reliance on Meg's family members, who were biased against him shows actual malice, the evidence demonstrates that Travis's independent investigation involved many sources other than Meg's family, and he invited comment from Ladner to counter his reports. See *Levan v. Capital Cities/ABC, Inc.*, 190 F3d 1230, 1243 (III)

punctuation omitted; emphasis supplied).

(11th Cir. 1999) ("The decision to air the interview of one person and not another is at heart an editorial decision," and publisher's decision not to present opposing views as strongly as plaintiff would have does not amount to actual malice); *Lohrenz v. Donnelly*, 350 F3d 1272, 1286 (D.C. Cir. 2003) ("reporting perspectives at odds with the publisher's own tend[s] to rebut a claim of malice, not to establish one.") (citation and punctuation omitted).

Ladner additionally takes issue with the strong language Travis employed in reporting the story arguing that it reflected the reporter's ill will toward him. However, "[a]ctual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself." (Citation and punctuation omitted.) *Cottrell*, 299 Ga. at 525. See also *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 56 (III) (230 SE2d 45) (1976) ("Constitutional malice does not involve the motives of the speaker or publisher, though they may be wrong[.]"). Ladner finally asserts that Travis admitted in his deposition that the Army never used the language that "it was just not true" that Ladner had a Purple Heart; rather, Travis said those were his own words. However, Travis testified that he talked with one individual from the Army who told him that there was no record of a Purple Heart in the Army's files. He could not recall

23

the exact language that the individual used to convey that information, but he believed that the lack of any evidence of a Purple Heart equated with saying that "it was not true." This testimony and the other evidence cited by Ladner fall short of raising a jury issue as to whether Travis knew that his report was false or acted in reckless disregard of its truth. See *Torrance*, 289 Ga. App. at 138-41 (summary judgment proper where plaintiff failed to meet his "heavy burden" to show actual malice); *Williams*, 140 Ga. App. at 55 (III) (summary judgment appropriate where plaintiff failed to counter defendant's negation of actual malice); *Lohrenz*, 350 F3d at 1286 (no actual malice where publisher had basis for reports on Navy pilot's record but also reported that Navy officials held different views). Cf. *Lake Park Post, Inc. v. Farmer*, 264 Ga. App. 299 (590 SE2d 254) (2003) (affirming jury's finding of actual malice where reporters failed to publish credible evidence contradicting their report that sheriff had murdered arrestee); *Barber v. Perdue*, 194 Ga. App. 287 (390 SE2d 234) (1989) (denying summary judgment on actual malice claim where defendant misrepresented effect of third party's nolo contendre plea as a plea of guilt and stated plaintiff was guilty of bribery "as though it were an official fact, despite the accusation's not having been proved beyond a reasonable doubt in a court of law").

Accordingly, we affirm the trial court's grant of summary judgment to Fox 5.

*Judgment affirmed. Barnes, P. J., and Mercier, J., concur.*