**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**RICKMAN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 2, 2018**

# In the Court of Appeals of Georgia

A18A0843. ROSSER v. CLYATT et al.
A18A0987. CLYATT v. GRADY ELECTRIC MEMBERSHIP CORPORATION.

McFADDEN, Presiding Judge.

Under the Georgia Electric Membership Corporation Act, OCGA § 46-3-170 et seq., customers of an electric membership corporation generally are members of the corporation with certain rights. OCGA §§ 46-3-260, 46-3-266. These two cases arise from a dispute among some members of the Grady Electric Membership Corporation ("Grady EMC") and its management team.

The dispute ended up in court, and the parties settled. Five months later, Thomas A. Rosser, Sr., the former president and general manager who resigned pursuant to the settlement agreement, filed a defamation lawsuit against four Grady EMC members who had formed a group called Take Back Our Grady EMC; a

business with a Facebook page on which messages about Rosser were posted; and the local newspaper. In Case No. A18A0843, Rosser appeals the grant of the defendants' motion to strike the defamation lawsuit under Georgia's Anti-SLAPP ("strategic litigation against public participation") statute, OCGA § 9-11-11.1. We hold that the trial court did not err in determining that the anti-SLAPP statute applies and that Rosser had not established that there is a probability that he would prevail on his claims. So we affirm the judgment.

Case No. A18A0987 stems from a separate, but related, lawsuit. In that case, Grady EMC sued William Gordon Clyatt, one of the founders of Take Back Our Grady EMC. Grady EMC sought, among other things, to permanently enjoin Clyatt from publicly disclosing certain records obtained in the earlier, settled litigation. Clyatt appeals the trial court's order granting injunctive relief. Because there is no evidence that Grady EMC would suffer an imminent and irreparable injury absent the permanent injunction, we reverse the grant of injunctive relief. We affirm the trial court's other rulings.

*Case No. A18A0843.*

1. *Background.*

2

Grady EMC, like all EMCs, is a "private, nonprofit, electric utilit[y] owned by the members [it] serve[s]." *Walker v. Oglethorpe Power Corp.*, 341 Ga. App. 647 (802 SE2d 643) (2017). See OCGA § 46-3-170 et seq. It has the exclusive right to furnish service within its service area. See *Sawnee Elec. Membership Corp. v. Ga. Pub. Svc. Comm.*, 273 Ga. 702, 707 (544 SE2d 158) (2001). Grady EMC has more than 13,000 members.

In 2014, Clyatt, a member of Grady EMC, began questioning some of management's decisions, including, among other things, lending $468,000 to Rosser; hiring Rosser's son as president and general manager of Grady EMC to succeed Rosser; and holding tens of millions of dollars in earnings instead of returning the money to the member-owners.

In April 2014, Clyatt met with Grady EMC leadership to discuss his concerns, but he was not satisfied with their response. Clyatt purchased nine advertisements in the local newspaper, the Cairo Messenger, to publicize his concerns. Other members of Grady EMC contacted Clyatt, and ultimately a group of them, including Clyatt and defendants Ronald Sellars, Seaborn Roddenberry, and Jerome Ellis, formed a committee they called "Take Back Our Grady EMC."

3

In 2014, the group filed a lawsuit against Grady EMC, Rosser, his son, and other officers and directors. The parties resolved the litigation by entering a settlement agreement that, among other things, required Rosser to resign his employment and terminate any affiliation, other than as a member, with Grady EMC and its entities, and required the formation of a special committee to evaluate the claims of Take Back Our Grady EMC and advise the board. As a result, the trial court entered a consent order dismissing the case with prejudice on May 24, 2016.

Five months after the dismissal of the 2014 lawsuit, Rosser filed this action, alleging that certain statements written by Clyatt were defamatory. He sued Clyatt, Sellars, Roddenberry, Ellis, Jane and John Doe defendants, Deep South Coins and Jewelry, Inc., which is owned by Clyatt and whose Facebook page included statements about Rosser, and the Messenger Publishing Company, the publisher of the local newspaper, the Cairo Messenger, which published Clyatt's and Take Back Our Grady's paid advertisements about Rosser. The defendants answered the complaint and moved to strike it under OCGA § 9-11-11.1, Georgia's anti-SLAPP statute. The trial court granted the motions to strike and Rosser filed this appeal.

2. *The anti-SLAPP statute applies.*

Rosser argues that the trial court erred by striking his lawsuit under OCGA § 9-11-11.1 because the anti-SLAPP statute does not apply. We disagree.

(a) *The two-step framework.*

OCGA § 9-11-11.1 is intended to protect persons exercising their constitutional rights of petition and freedom of speech. See OCGA § 9-11-11.1 (a). To accomplish this goal, the statute is to be construed broadly. Id.

First enacted in 1996, the statute was significantly revised effective July 1, 2016. *Neff v. McGee*, 346 Ga. App. 522, 524 n. 2 (816 SE2d 486) (2018). The revised statute applies to this case even though some of the allegedly defamatory statements were made prior to July 1, 2016. See generally *Crane Composites v. Wayne Farms, LLC*, 296 Ga. 271, 273 (765 SE2d 921) (2014) ("[B]ecause the rights created by the statute pertain to the conduct of litigation, the statute is acting prospectively, not retroactively, when applied to litigation commenced after the effective date."). See also *Atlanta Humane Society v. Harkins*, 278 Ga. 451, 454 (1) (603 SE2d 289) (2004).

The revision did three things. It expanded the scope of protected speech to include any conduct that reasonably could be construed as conduct related to "a matter of public concern in furtherance of the right to petition, not just to speech

5

connected to an official proceeding (subsection (c) (4))[.]" *Neff*, 246 Ga. App. at 524 n. 2. The only speech protected under the former version of the statute was speech connected to an official proceeding. See *Emory Univ. v. Metro Atlanta Task Force for the Homeless*, 320 Ga. App. 442, 444-445 (1) (740 SE2d 219) (2013).

The revision "replaced the plaintiff's complaint verification requirement with a probability-of-success standard (subsection (b) (1))[.]" Id. And it "provided a right of direct appeal from the grant or denial of a motion to dismiss under the statute (subsection (e))." Id. The statute now provides:

> A claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern shall be subject to a motion to strike unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim.

OCGA § 9-11-11.1 (b) (1).

The application of the statute "involves a two-step process for determining whether a claim is subject to being stricken. In the first step, the defendant bringing an anti-SLAPP motion to [strike] must make a prima facie showing that the plaintiff's

6

suit is subject to OCGA § 9-11-11.1. . . ." *Neff*, 346 Ga. App. at 524-525. The defendant does this by showing that the defendant's challenged acts could reasonably be construed as acts taken in furtherance of his or her constitutional rights of petition or free speech in connection with an issue of public concern as defined by the statute. OCGA § 9-11-11.1 (b) (1).

"The burden then shifts to the plaintiff to demonstrate that there is a 'probability' that [he] will prevail on [his] claims at trial. OCGA § 9-11-11.1 (b) (1)." *Neff*, 346 Ga. App. at 525. Unlike the former versions of the anti-SLAPP statute (where a motion to strike was a remedy for a failure to comply with the statute's procedural verification requirement), the current version of the statute contemplates a substantive, evidentiary determination of the plaintiff's probability of prevailing on his claims. It directs the court to "consider . . . supporting and opposing affidavits" and it provides for "discovery on the sole issue of actual malice," should there be a claim that the plaintiff is a public figure. OCGA § 9-11-11.1 (b) (2). See also *Carbone v. CNN*, No. 1:16-CV-1720-ODE, 2017 U.S. Dist. LEXIS 216286, at *7 (N.D. Ga. Feb. 14, 2017) ("The statute essentially creates a Rule 12 (b) (6) 'plus' standard for cases with a First Amendment nexus.").

(b) *The statute applies.*

Rosser argues that the anti-SLAPP statute does not protect the defendants here because, contrary to the trial court's finding, the allegedly defamatory statements were not made "in connection with an issue of public interest or concern." He adds that to the extent the statements did relate to a matter of public interest, that was only because the statements themselves created public interest; when the statements were published in June, July, and August 2016, there was no public controversy because the 2014 lawsuit had been settled.

We agree with the trial court that the statements "could reasonably be construed as" having been made "in connection with an issue of . . . public concern," see OCGA § 9-11-11.1 (b) (1), the management and operation of Grady EMC, including the upcoming election of members of the board of directors. "[I]t is evident that resolution of the controversy [would] affect people who do not directly participate in it, [the more than 13,000 members of Grady EMC, so] the controversy is more than merely newsworthy and is of legitimate public concern." *Gettner v. Fitzgerald*, 297 Ga. App. 258, 263 (1) (c) (i) (677 SE2d 149) (2009) (citation omitted) (defamation case). See also *Buckley v. Directv, Inc.*, 276 FSupp2d 1271, 1275 (N.D. Ga. 2003) ("Any action involving such a large number of people is, by definition, a matter of public interest and concern."). According to the owner, editor, and publisher

of the Cairo Messenger, the criticisms of the management of Grady EMC "had generated . . . a public discussion" because Grady EMC is a "major employer" in the community and a "major factor in everyday life, being the utility." See *Mathis v. Cannon*, 276 Ga. 16, 20-21 (573 SE2d 376) (2002) (local controversy concerning the unprofitable operation of a solid waste recovery facility in Crisp County was a matter of public concern).

We reject Rosser's argument that because the earlier lawsuit had been settled the matter was no longer a public concern. Under the settlement, Rosser and the other defendants did not admit liability. And the settlement agreement required the formation of a committee to study many of the issues Clyatt had questioned, including whether Grady EMC's patronage-capital policy (under which earnings are returned to members) should be modified; whether bylaws should be modified; and whether Grady EMC's policies regarding issuing company vehicles should be modified. The agreement required the committee to present its report to the board of directors and to Clyatt and the other plaintiffs by September 2016. In other words, some of the issues raised in the lawsuit had not been resolved.

Morever, separate and apart from the settlement, the defendants (or at least some of them) sought to replace two members of the board of directors at an

9

upcoming board election. The allegedly defamatory statements were made to further that goal. For example, in one of the advertisements published on July 13, 2016, in the Cairo Messenger, Take Back Our Grady EMC wrote that the board members had "failed this membership and it's time they were replaced"; that the committee was "dedicated to ending the reign of three generations of the Rossers as well as the present board that has allowed corruption to plague our Grady EMC"; and that the committee "will not rest until the Rossers and the present board of directors are gone." Another advertisement listed the changes the group wanted the board to make. Indeed, Rosser admits in his appellate brief that the statements were made "with the hopes that [they] would affect the election of the Grady EMC Board of Directors."

Finally, indicating that the matter was still of public concern, on June 8, 2016, after the settlement and some of the allegedly defamatory statements had been made, the Cairo Messenger published a letter to the editor from the Grady EMC board itself. In the letter, the board expressed disappointment with Clyatt for continuing with his criticisms after the settlement of the lawsuit, voiced support for the leadership of Rosser and his son who succeeded him, and suggested that it was "time to move on."

The trial court did not err in finding that the defendants met their burden of making a prima facie showing that the statements reasonably could be construed as

10

acts in furtherance of their constitutional rights in connection with an issue of public concern. OCGA § 9-11-11.1 (b) (1).

3. *The trial court did not err in determining that Rosser had not established that there is a probability that he will prevail on his claims*.

Rosser argues that the trial court erred in striking his lawsuit without determining whether there was a probability that he would prevail on his claims. See OCGA § 9-11-11.1 (b) (1). The trial court did make such a determination, albeit implicitly, holding that "the complained-of [s]tatements were merely statements which reflect an opinion or subjective assessment as to which reasonable minds could differ which cannot be proved false." This necessarily implies that the trial court determined that there was not a probability that Rosser would prevail on his claims.

Rosser then argues that, to the extent the trial court did make such a determination, the court erred. We disagree. We cannot say that the trial court erred in determining, based on the undisputed material facts, that Rosser had not satisfied his burden of demonstrating that there is a probability that he will prevail on his claims. OCGA § 9-11-1.1 (b). As detailed below, some of the allegedly defamatory statements are opinion that cannot be proven true or false, so they are not actionable. And the non-opinion statements are not actionable because Rosser is a limited-

11

purpose public figure and he has not established that there is a probability that he will prevail by pointing to clear and convincing evidence that the defendants published the statements with actual malice. So the trial court did not err in determining that Rosser has not shown a probability that he will succeed on his claims, and the trial court did not err in granting the defendants' motions to strike.

(a) *The statements at issue*.

In his brief, Rosser argues about the following allegedly defamatory statements contained in his complaint, all of which were written by Clyatt:

[Rosser] has stolen from the EMC for years. There are many ways to steal.

Did Tommy Rosser get money for [the Sowega Power, LLC] transaction?

One question to ask yourself why was Tommy Rosser forced to resign. Not for being a great employer or an honest person. He has stolen from the EMC for years.

Tommy Rosser had no idea that the fraud and corruption would be uncovered.

Were the personal cars of either Tommy Rosser, Bo Rosser, or their spouses paid for by the membership of the Grady EMC?

12

Did Tommy Rosser or any current former director, officer, or employee of Grady EMC ever have or had any ownership or membership interest or profit in any of the 7 for-profit LLCs and corporate entities in the past? We can prove that they did.

This is a conspiracy by the Rossers and some of the board members to benefit themselves with the funds and assets of the Grady EMC and its membership.

For over 70 years the past and present board members and three generations of Rossers have allowed corruption and unethical practices to take place at the Grady EMC.

If there are no unethical wrongdoings to answer for, then why did Tommy Rosser begin transferring all of his properties out of his name once the lawsuit was filed? Moving? Going on a trip? You be the judge.

Did the board and the Rossers receive kickbacks from vendors?

The Rossers, and others associated with Grady EMC have misled the members/owners for 78 years. They have used our money to enrich themselves while living lavish lifestyles. Tommy Rosser has mislead, pillaged the Grady EMC funds and worst of all, double-crossed all but one of the board of directors which he worked for . . . . One way that Tommy and Bo Rosser have misled the membership is through the forming of for-profit LLCs. If you will remember, this very same thing

13

happened at Cobb EMC. . . . These LLCs are a way the Rosser[s] and directors move and hide the members['] money.

The corrupt practices outlined in [Cobb EMC's] audit mirrors that which has been and is occurring at Grady EMC. Simply substitute the names and companies with the Rossers and Grady EMC and you'll have a clear picture of what has happened at Grady EMC.

(b) *Opinion.*

"The expression of opinion on matters about which reasonable people might differ is not libelous." *Davis v. Sherwin-Williams Co.*, 242 Ga. App. 907 (531 SE2d 764) (2000). Many of these statements, such as "Tommy Rosser had no idea that the fraud and corruption would be uncovered," are non-actionable opinion as the trial court found. Rosser argues that even if some of the statements were opinion, they are nonetheless actionable because they imply defamatory facts that can be proven false. We disagree.

[Rosser's] reasoning is unpersuasive because implicit in it is the assumption that [the defendants] used the word[s] ["stolen, "steal," "stole," "fraud," "corruption," and "conspiracy"] in [their] legal sense and thereby implied some objective facts which make [Rosser guilty of crimes] as determined under Georgia law. Having reviewed [the defendants'] statement[s] in . . . context[, as described in Division 2 (a)], we cannot make this assumption. It is apparent from the context . . . that

14

[the defendants] did not use the [words] in [their] legal sense or as a legal conclusion, but used [them] only to express [their] subjective opinion criticizing [Rosser's management of Grady EMC]. More importantly, the average reader would not have construed [the defendants'] statement[s] to be . . . legal conclusions that [Rosser committed crimes]. . . . [Rather,] the average reader . . . would have taken the statement[s] for what [they were], [] subjective, hyperbolic opinion[s] that cannot be proved to be true or false and that concern[] a matter on which reasonable people might differ; i.e., [whether Rosser mismanaged Grady EMC to his benefit and to the detriment of the members].

*Webster v. Wilkins*, 217 Ga. App. 194, 195 (1) (456 SE2d 699) (1995) (citations omitted).

(c) *Rosser is a limited-purpose public figure.*

Whether Rosser is a public figure "is a critically important issue, because in order for a public figure to recover in a suit for defamation, there must be proof by clear and convincing evidence of actual malice on the part of the defendant. Plaintiffs who are private persons must only prove that the defendant acted with ordinary negligence." *Riddle v. Golden Isles Broadcasting*, 275 Ga. App. 701, 703 (1) (621 SE2d 822) (2005) (citation and punctuation omitted).

15

Although the trial court did not expressly address this argument, we address it under the right-for-any-reason rationale. See, e.g., *Bobick v. Community & Southern Bank*, 321 Ga. App. 855, 869-70 (4) (b) (743 SE2d 518) (2013) (affirming dismissal under "right for any reason" doctrine); *C. C. Leasing Corp. v. Bd. of Tax Assessors of Hall County*, 143 Ga. App. 520, 521 (239 SE2d 204) (1977) (same).

Contrary to Rosser's argument, the evidence demonstrates that Rosser is a public figure for purposes of this controversy. When

> an individual voluntarily injects himself or is drawn into a particular public controversy[, he may] become[] a public figure for a limited range of issues. Whether a person is a public figure is a question of law that requires the court to review the nature and extent of the individual's participation in the specific controversy that gave rise to the alleged defamation. A three-part analysis is used to determine whether an individual is a limited-purpose public figure. Under this analysis, a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy.

*Cottrell v. Smith*, 299 Ga. 517, 525 (III) (A) (788 SE2d 772) (2016) (citation and punctuation omitted).

(1) *The public controversy.*

16

The first step in our analysis requires identification of a public controversy, which must be more than merely newsworthy. Rather, if it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern. In short, if the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy. Moreover, courts must look only to those controversies that already existed in the public arena before the alleged defamation.

*Ladner v. New World Communications of Atlanta*, 343 Ga. App. 449, 453 (1) (a) (806 SE2d 905) (2017) (citations and punctuation omitted).

Here, the public controversy is the operation and management of Grady EMC under Rosser's and his son's tenures and the upcoming board elections. Although Rosser resigned from Grady EMC, many of the decisions that were the subject of the allegedly defamatory comments were made by Rosser in his capacity as head of Grady EMC. And "the resolution of the controversy will affect people who do not directly participate in it," *Ladner*, supra, the more than 13,000 members of Grady EMC.

The controversy pre-existed the defendants' allegedly defamatory statements and survived the settlement. As noted in Division 2 (b), supra, the settlement

17

agreement left many issues unresolved, including the issue of Rosser's responsibility for the practices the defendants questioned as well as the upcoming board elections. "[T]he management of [Grady EMC] was still a matter of lively public interest; propositions for further change were abroad, and public interest in the way in which the prior administration had done its task continued strong." *Rosenblatt v. Baer*, 383 U. S. 75, 87 n.14 (III) (86 SCt 669, 15 LE2d 597) (1966). See *Ladner*, supra (rejecting plaintiff's claim that only the defendant's actions made the issue into a public controversy); *Purvis v. Ballantine*, 226 Ga. App. 246 (487 SE2d 14) (1997) (fact that allegedly defamatory statements were uttered three years after school superintendent's retirement did not change analysis where "public interest in the way in which the prior administration had done its task continued strong").

(2) *Rosser's involvement in the controversy*.

"A plaintiff in a libel case must be deemed a public figure if he purposefully tries to influence the outcome of a public controversy or, because of his position in the controversy, could realistically be expected to have an impact on its resolution."*Atlanta Humane Society v. Mills*, 274 Ga. App. at 163 (2) (b) (citation omitted). "[E]ven a single interview given to the media may be sufficient to establish a plaintiff as a limited-purpose public figure." Id. (citations omitted).

18

The record demonstrates that Rosser involved himself in this controversy. On August 24 and 31, 2016, Rosser placed advertisements in the Cairo Messenger addressed "[t]o the members of Grady EMC and the community," characterizing Clyatt's published statements as "half-truths or outright lies about [Rosser], [his] family, and Grady EMC." He denied any illegality and stated that he was "only guilty of doing what I thought was best for Grady EMC." See *Finkelstein v. Albany Herald Publishing Co.*, 195 Ga. App. 95, 97 (1) (392 SE2d 559) (1990) (plaintiff who made one appearance on a local television program and was quoted in one newspaper article was a public figure).

(3) *The alleged defamation was germane to Rosser's participation in the controversy*.

An allegedly defamatory publication "is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff." *Jones v. Albany Herald Publishing Co.*, 290 Ga. App. 126, 131 (1) (c) (658 SE2d 876) (2008) (citation omitted). As the former head of Grady EMC and the person who made the challenged decisions, Rosser was germane to the controversy and was a limited-purpose public figure in relation to it. *Atlanta Humane Society v. Mills*, 274 Ga. App. at 164 (2) (c).

19

(d) *Actual malice.*

"[I]n order for a public figure to recover in a suit for defamation, there must be proof by clear and convincing evidence of actual malice on the part of the defendant." *Ladner*, 343 Ga. App. at 452 (1) (citation omitted). A public figure proves actual malice by showing by clear and convincing evidence that the person who made the defamatory falsehood did so "with knowledge of its falsity or with reckless disregard for the truth." *Williams v. Trust Co.*, 140 Ga. App. 49, 52 (I) (230 SE2d 45) (1976) (punctuation omitted). See also *Evans v. Sandersville Georgian*, 296 Ga. App. 666, 668 (1) (675 SE2d 574) (2009) (to avoid summary judgment in his defamation suit against publisher of newspaper, plaintiff had to "make a showing with clear and convincing evidence that the statements complained of were made with actual malice — that is, with knowledge that they were false or with reckless disregard for their truth or falsity") (citation and punctuation omitted).

> (T)he standard of proof of actual malice is extremely high; it must be shown by clear and convincing evidence that false and defamatory statements were published with actual malice. Actual malice in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. Actual or constitutional malice is different from common law malice because knowledge of

20

falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

*Cottrell*, 299 Ga. at 525-26 (II) (A) (citation omitted). "Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. [The] failure to investigate does not in itself establish bad faith." *Williams*, 140 Ga. App. at 55 (III) (citations, punctuation, and emphasis omitted).

In arguing that Clyatt and the other defendants had actual malice, Rosser primarily points to evidence that he contends demonstrates that the statements were false. But "[i]t is not a question of the *truth* of the alleged falsehood. The defamatory statement may be false but it is still not actionable unless it was uttered with knowledge of its falsity or in reckless disregard for the truth." *Williams*, 140 Ga. App. at 62 (IV) (emphasis in original).

21

Rosser has not pointed to evidence showing that the defendants made the allegedly defamatory statements with knowledge of their falsity or in reckless disregard for the truth. Clyatt explained that his references to Rosser stealing were based on the fact that Rosser had EMC employees work on his personal vehicles (on company time, without personally paying them) and that he stored his personal vehicles at Grady EMC, using EMC electricity and facilities. Clyatt explained that had EMC assets not been used in that way, the assets would have been used to benefit Grady EMC, increasing the earnings allocated to members. He added that Rosser did not pay late fees on a loan he owed to Grady EMC. Clyatt also noted that the loan was not disclosed on the forms Grady EMC filed with the Internal Revenue Service.

Clyatt testified that he asked the question about Rosser transferring title to his properties once the 2014 lawsuit had been filed, because according to court documents, once the lawsuit was filed, Rosser transferred title to certain pieces of property. His question about the board and the Rossers receiving kickbacks was based on statements from unnamed sources, including, specifically, a statement that a manager had bragged about a tree-trimming company paying for his personal trips. Also, Clyatt questioned what could explain the $3.8 million renovation of the Grady EMC building, when the cost should have been half as much. He added that he had

been asking for documents, such as invoices from vendors, about this issue for three years, but was never given any.

Clyatt explained he based his questions about Sowega Power LLC — asking whether Rosser got money for the transaction — on the fact that Rosser was its registered agent. He based his statements and questions about the other for-profit LLCs on the research conducted by an attorney at a law firm that he consulted regarding his concerns. The attorney's research, according to Clyatt, had uncovered certain inexplicable transactions..

Clyatt believed that Rosser was forced to resign by the litigation committee that was appointed by the judge in the earlier action. Indeed, Rosser's counsel, during Clyatt's deposition, conceded that he knew that Clyatt thought that.

As for the question whether the membership of Grady EMC paid for the cars of Rosser, his son, and their spouses, Clyatt testified that he had asked for documents regarding this issue, but did not receive them. He noted, however, that 25 employees drove lavish, EMC-owned cars; they drove the cars home at night; and Grady EMC did not require them to pay for the personal use.

Clyatt added that all of his research had "a bearing on [his] frame of mind when [he] was writing these articles," and that he would believe that Rosser and the board of directors had deceived Grady EMC's members "to the day [he goes] to the grave."

As for whether the newspaper acted with actual malice, the owner, editor, and publisher of the Cairo Messenger testified that the paper makes every effort to verify the truthfulness of what it publishes. He had "no reason to doubt" Clyatt, whom he had known for 30 years and who had never lied to him, and "had no reason to think he's not trustworthy." The publisher testified that he did not know of anyone more knowledgeable about the allegations than Clyatt, who "had done a lot of investigating" and may have gathered information due to his status as a plaintiff in the earlier lawsuit. The publisher knew about Rosser's having staff work on his cars, storing his cars at Grady EMC, and the loan. The publisher testified that he had been shown documents and had a reasonable belief that they were true.

Rosser has pointed to "no evidence, much less 'clear and convincing' evidence, that [the defendants] disbelieved [the statements] or that [they] otherwise had a high degree of awareness of the probable falsity of what [they] posted [and published]. . . . [T]he evidence more forcefully supports the opposite conclusion, i.e., that [the

24

defendants] believed what . . . [they published and ] posted." *Cottrell*, 299 Ga. at 528 (1) (footnote omitted).

4. *Failure to conduct a hearing.*

Rosser argues that the trial court erred by granting the motion to strike without conducting a hearing. Rosser relies on OCGA § 9-11-11.1 (d), which provides:

> All discovery and any pending hearings or motions in the action shall be stayed upon the filing of [an anti-SLAPP] motion to dismiss or [an anti-SLAPP] motion to strike made pursuant to subsection (b) of this Code section until a final decision on the motion. The motion shall be heard not more than 30 days after service unless the emergency matters before the court require a later hearing. The court, on noticed motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted notwithstanding this subsection.

OCGA § 9-11-11.1 (d).

In *Jefferson v. Stripling*, 316 Ga. App. 197, 200 (3) (728 SE2d 826) (2012), we held that the statute mandates a hearing on motions to dismiss or strike under OCGA § 9-11-11.1. But our Supreme Court's recent opinion in *City of College Park v. Martin*, __ Ga. __ (__ SE2d __), 2018 Ga. LEXIS 578, at *4-5 (Case No. S17G2008, decided Aug. 27, 2018), casts doubt upon that holding. In that case, the Court held

25

that similar language, the public-vote language of the Open Meetings Act, OCGA § 50-14-3 (b) (2), did not mandate any particular action:

> The phrase "the vote . . . shall be taken in public" employs the use of a definite article ("the") and is therefore referential, presupposing a required action. Simply put, the language does not mandate a vote on a relevant employment decision, it simply references such vote and requires that any such vote be taken in public. Thus, consistent with the design of the Open Meetings Act, the plain language of (b) (2) requires that when a vote on a relevant employment matter is taken, it must be taken in public.

Id. Similarly, the phrase in the anti-SLAPP statute that "[t]he motion [to dismiss or strike] shall be heard not more than 30 days after service," OCGA § 9-11-11.1 (d), could simply mean that should the trial court conduct a hearing on a motion to dismiss or strike, the hearing must occur within 30 days after service.

We need not decide whether *Jefferson*, 316 Ga. App. at 197 (3), was correctly decided, however. Because the material facts are undisputed, in the interest of judicial economy, we may exercise our discretion to address the issues Rosser raises in his appeal. *Massey v. Allstate Ins. Co.*, 341 Ga. App. 462, 469 (2) n.9 (800 SE2d 629) (2017). See also *Jones v. Spruill*, 337 Ga. App. 200, 202 (1) (786 SE2d 848) (2016) (physical precedent only) (where facts are undisputed and issue before court is

26

question of law, "judicial economy dictates that we exercise our discretion to address the controlling question of law rather than require the same issue to arise on any subsequent appeal"); *J. M. High Co. v. Arrington*, 45 Ga. App. 392, 392 (3) (165 SE 151) (1932) (where the material facts are undisputed and the issue on appeal is a question of law, "it is unnecessary to send the case back for another hearing in the trial court"); accord *Ingraham v. Marr*, 246 Ga. App. 445, 447 (2) (540 SE2d 652) (2000).

*Case No. A18A0987.*

5. *Background.*

This related case involves Grady EMC's action to enjoin Clyatt from publicly sharing certain records from the 2014 litigation. Grady EMC filed a complaint asserting breach of contract and seeking a temporary restraining order and preliminary injunction. The breach of contract claim stemmed from an email agreement between the attorneys in the 2014 litigation. In that email exchange, the attorney representing the plaintiffs, Clyatt and the others, agreed that "[a]t this time we will not share an[y] documents [provided to a litigation review committee appointed in the 2014 litigation] with anyone other than the plaintiffs."

27

Clyatt answered the instant complaint and filed a motion to strike under OCGA § 9-11-11.1. Clyatt requested a hearing on his motion to strike, and the trial court set and conducted a hearing. See OCGA § 9-11-11.1 (d). At the hearing, the parties agreed that "personal identifying information that [is] contained in the documents will be redacted and not shared beyond the people who have already seen it."

Four days after the hearing, Grady EMC filed a pleading entitled "first amended complaint" in which it sought "more limited relief [than requested in the original complaint] given facts discovered" at the hearing. In light of the parties' stipulation at the hearing, Grady EMC asserted that it only sought to "enjoin Clyatt from sharing with anyone the private information in the documents," in accordance with Clyatt's agreement to redact such information. Grady EMC explicitly asserted that it sought no further relief.

The next day, the trial court entered the order on appeal. Based on the parties' stipulation at the hearing, the court enjoined Clyatt from publishing personal, identifying information in the records, including dates of birth, social security numbers, driver's license numbers, and checking account numbers. The court found that during the hearing, before the court and on the record,

28

Clyatt explicitly and solely agreed/stipulated that he would voluntarily enjoin himself and forgo publishing any personal private information contained in the documents produced to him by Grady EMC during previous litigation. Unambiguously, Defendant Clyatt agreed not to publish personal identifying information contained within said records, specifically including dates of birth, social security numbers, driver's license numbers, and actual account numbers listed on business or personal checks.

The court ruled that other than this restriction, Clyatt's use of the documents was not enjoined. The court determined that given the stipulation and Grady EMC's amendment to its complaint, Clyatt's motion to strike under OCGA § 9-11-11.1 was moot. Clyatt filed a notice of appeal. He also filed a motion for attorney fees under OCGA § 9-11-11.1 (h) and OCGA § 9-15-14. There is no order resolving that motion in the appellate record.

6. *Grant of injunctive relief.*

Clyatt argues that the trial court erred by granting Grady EMC injunctive relief because the court lacked jurisdiction; because Grady EMC lacked standing; because the amended complaint was in reality a supplemental pleading for which Clyatt was not given notice; and because the injunction merely pre-emptively enforced Clyatt's

gratuitous promise, thereby exposing him to criminal sanctions. We agree that the trial court erred by granting Grady EMC injunctive relief.

> Entry of a permanent injunction is appropriate only in clear and urgent cases where there is a vital necessity to prevent a party from being damaged and left without an adequate remedy at law. Equitable relief is a matter within the sound discretion of the trial court. The grant of a permanent injunction is to be sustained on review unless the trial court has manifestly abused its discretion. A trial court manifestly abuses its discretion when it grants an injunction adverse to a party without any evidence to support such judgment and contrary to the law and equity.

*Savannah Cemetery Group v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 210 (2) (704 SE2d 858) (2010) (citations omitted). "Injunction ought not to be granted unless the injury is pressing and the delay dangerous, and there is no adequate remedy at law. . . . No allegation is made that [Clyatt] has improperly [disclosed personal identifying information]." *Lue v. Eady*, 297 Ga. 321, 329 (2) (c) (773 SE2d 679) (2015). In fact, as noted, Clyatt stipulated in open court that he will not do so."Courts of equity will not exercise this power to allay mere apprehensions of injury, but only where the injury is imminent and irreparable and there is no adequate remedy at law."

*Morton v. Gardner*, 242 Ga. 852, 856 (252 SE2d 413) (1979) (citation and punctuation omitted).

Here, there were no allegations, much less evidence of, Grady EMC imminently suffering an injury because of Clyatt's disclosure of personal identifying information. Under these circumstances, the trial court erred and the grant of injunctive relief is, therefore, reversed. See *Parker v. West View Cemetery Assn.*, 195 Ga. 237, 243 (24 SE2d 29) (1943) (finding that defendants would not engage in certain behavior in the future meant that interlocutory injunction was unnecessary); *Behn & Foster v. William H. Young & Co.*, 21 Ga. 207, 211 (1857) ("It is good ground to refuse an injunction, if the party against whom it is moved propose in the presence of the Chancellor to do all that a Court, on the most favorable construction of complainant's case, ought to decree for him, provided he complies with his proposition.").

7. *Motion to strike under the anti-SLAPP statute.*

Clyatt argues that the trial court erred in denying his motion to strike and finding it moot. He argues that Grady EMC's claims in its original complaint were not resolved by the attempt to eliminate them by amending the complaint, and they are subject to his motion to strike under OCGA § 9-11-11.1 (b) (1). But Clyatt

31

conceded in the trial court that the amended complaint was effective to eliminate the other claims for relief. And he stipulated that he would do what Grady EMC sought in its only remaining claim. So Grady EMC has no viable claims for relief against Clyatt and there is nothing to strike. His motion to strike, therefore, is moot. See Black's Law Dictionary (10th ed. 2014) (defining "moot" as "[h]aving no practical significance; hypothetical or academic).

Clyatt alleges that he was harmed because the trial court's mootness order removed the case from the attorney fees provision of OCGA § 9-11-11.1 (b.1). This argument is premature. As described above, Clyatt's motion for attorney fees is pending. And the anti-SLAPP statute contemplates awarding fees when litigation is terminated by a plaintiff's dismissal. OCGA § 9-11-11.1 (h). So the trial court may consider, when assessing Clyatt's fee request, whether Clyatt is a "prevailing moving party," OCGA § 9-11-11.1 (b.1), given Grady EMC's withdrawal of all of its claims for relief but for the injunction and our holding that the trial court erred in entering the injunction.

We deny Clyatt's request for an award of fees for the costs of this appeal.

*Judgment affirmed in Case No. A18A0843. Judgment affirmed in part and reversed in part in Case No. A18A0987. Rickman and Goss, JJ., concur in the judgments only.\**

**THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2.**