**SECOND DIVISION**
**MILLER, P. J.,**
**HODGES and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

June 29, 2021

# In the Court of Appeals of Georgia

A21A0582, A21A0639. LANE DERMATOLOGY et al. v. SMITH et al; and vice versa.

MILLER, Presiding Judge.

After Laura Frances Smith left her employment with Lane Dermatology & Dermatologic Surgery, LLC ("Lane Dermatology"), she became employed as a physician's assistant with Skin Cancer Specialists, PC ("SCS"). Lane Dermatology brought the instant action against Smith and SCS, arguing that Smith's employment with SCS violated the restrictive covenants in her employment contract. In Case No. A21A0582, Lane Dermatology seeks review of the trial court's order denying its motion for an interlocutory injunction to enforce the covenants. In Case No. A21A0639, Smith cross-appeals from the trial court's denial of her motion to dismiss Lane Dermatology's complaint under the anti-SLAPP statute (OCGA § 9-11-11.1).

After a thorough review of the record, we conclude that the trial court did not abuse its discretion when it denied Lane Dermatology's request for an interlocutory injunction, and we conclude that Smith has not made a threshold showing that the claims in this case arise from statements made "in connection with an issue of public concern" so as to fall within the ambit of the anti-SLAPP statute. We therefore affirm the trial court's judgment in both cases.

The record indicates that Smith was employed as a physician's assistant with Lane Dermatology in its Columbus, Georgia office from 2013 until September 2019. As part of her employment contract, Smith agreed to various restrictive covenants, including a non-compete covenant which provided as follows:

> For the purposes of this Section, the term "Territory" shall mean the geographic area located within 15 miles from the primary business office of Employer located at 1210 Brookstone Centre Parkway, Columbus, Georgia. For and in consideration of the amounts being paid by Employer to Employee hereunder, Employee agrees that upon termination of Employee's employment, Employee will not provide services as a Physician's Assistant within the Territory for a period of two years following the termination of this Agreement.

The agreement also contained a non-solicitation covenant, which provided:

> Employee agrees that, without Employer's prior written consent, during the two year period commencing on the termination of Employee's employment, Employee will not, on Employee's own behalf or on behalf of any other individual or entity, solicit any patient

2

of Employer to see or obtain dermatology services from any provider other than Employer. This Section applies only to those patients to whom Employee provided medical services as a Physician's Assistant during her employment with Employer.

In September 2019, Smith resigned from her employment with Lane Dermatology and left in good standing. Smith began working at a dermatology center in Charleston, South Carolina, but she resigned on March 23, 2020, because she was planning to return to Columbus. Around that time, Smith contacted Lane Dermatology and was told that she could return to work for them. Smith also received a message and phone call from Dr. Mark Chastain, who offered her a position at SCS.

When Smith returned to Columbus on April 14, 2020, she was still considering whether to work for Lane Dermatology or SCS. During this time, Lane Dermatology reached out to its own patients about Smith's return. Smith ultimately accepted the offer to work for SCS at their Newnan, Georgia office, which was effective May 1, 2020, and she began working there on May 19, 2020. Smith promptly notified Lane Dermatology that she was not accepting a position with them and was pursuing other employment.

After Smith agreed to work for SCS, SCS ordered a new nameplate for its Columbus office that listed Smith's name as one of its providers. The nameplate consists of the practice's name "Skin Cancer Specialists, P.C. & Aesthetic Center" in large letters and then lists, in smaller letters, the names of its doctors and other medical providers, including Smith. The sign lists all the providers that work for SCS, including those that only work in the Newnan office. SCS and its sign are located along the same road as Lane Dermatology's office such that "patients will . . . [drive] right past this sign on the way to [Lane Dermatology]."

On May 20, 2020, Lane Dermatology brought this lawsuit, alleging that Smith violated her non-compete and non-solicitation covenants and seeking declaratory and injunctive relief.[1] Lane Dermatology also sought a temporary restraining order and interlocutory injunction to prevent Smith from continuing to violate the restrictive covenants and to remove the nameplate showing that Smith is an employee of SCS. In response, Smith filed a motion to strike Lane Dermatology's claims under the anti-SLAPP statute because the claims were based on the exercise of speech by displaying the nameplate.

---

[1] Lane Dermatology also brought a claim against SCS for tortious interference.

Following a four-day evidentiary hearing, the trial court denied the motion for a preliminary injunction and denied Smith's motion to dismiss. The trial court first concluded that Lane Dermatology failed to produce evidence that Smith had violated either of the two restrictive covenants. The trial court held that there was no evidence that Smith was working as a physician's assistant within the restricted area and that Smith did not "provide services" in Columbus simply because her name was on SCS's nameplate. The trial court also found that Lane Dermatology did not provide evidence that Smith violated the non-solicitation provision because (1) the evidence showed that Smith only solicited patients to see her at Lane Dermatology, not SCS; (2) any communications by the patients to Smith regarding SCS were initiated by the patients; and (3) merely having Smith's name on the nameplate did not constitute the solicitation of patients. The trial court further concluded that Lane Dermatology had not shown that it had incurred any financial injury or lost any patients due to Smith or SCS and that the balance of harms and the public interest both weighed against granting an injunction. The trial court finally concluded that Lane Dermatology's claims regarding the nameplate with Smith's name did not invoke a constitutional denial of free speech as to matters of public interest or significance so as to come within the ambit of the anti-SLAPP statute. Lane Dermatology now appeals from the

5

denial of its request for an injunction, and Smith cross-appeals from the denial of her motion to dismiss.

*Case No. A21A0582*

1. Lane Dermatology primarily argues that, for various reasons, the trial court erred in denying its request for injunctive relief because it established that Smith breached the restrictive covenants and that it had suffered (and would continue to suffer) actual loss of patients because of those breaches. We address each of Lane Dermatology's arguments in turn and conclude that the trial court did not abuse its discretion in denying an interlocutory injunction to enforce the covenants.

> In deciding whether to issue an interlocutory injunction, the trial court should consider whether: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of [the] claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest. Although an interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised, the trial court is vested with broad discretion in making that decision. We will not reverse the trial court's decision to grant or deny an interlocutory injunction unless the trial court made an error of law that contributed to the decision, there was no evidence on

6

an element essential to relief, or the court manifestly abused its discretion.

(Citation omitted.) *Western Sky Financial, LLC v. State ex rel. Olens*, 300 Ga. 340, 352 (2) (b) (793 SE2d 357) (2016). The Supreme Court of Georgia "has declared that the first factor is the most important one, given that the main purpose of an interlocutory injunction is to preserve the status quo temporarily to allow the parties and the court time to try the case in an orderly manner." Id. at 354 (2) (b). "[W]here the trial court, in ruling on an interlocutory injunction, makes findings of fact based upon conflicting evidence, this court will not disturb the ruling as an abuse of discretion unless the denial or granting of the injunction was based on an erroneous interpretation of the law." (Citation omitted.) *Westpark Walk Owners, LLC v. Stewart Holdings, LLC*, 288 Ga. App. 633, 635 (655 SE2d 254) (2007).

(a) Lane Dermatology first argues that it provided evidence showing that Smith was soliciting its patients to work with her at SCS. Lane Dermatology points in particular to the evidence that Smith was communicating with Lane Dermatology's patients prior to her employment with SCS. We disagree.

Here, the non-solicitation provision prohibits Smith from "solicit[ing] any patient of [Lane Dermatology] to seek or obtain dermatology services from any

7

provider other than [Lane Dermatology]." Lane Dermatology points to text messages between Smith and Lane Dermatology's administrator and between Smith and many of Lane Dermatology's patients, but those messages, crucially, involved discussions about patients receiving services from Smith at *Lane Dermatology*, not at SCS. Thus, those communications did not violate the non-solicitation provision. Lane Dermatology offers speculation that Smith and SCS used those communications to later lure their customers to SCS, but Lane Dermatology admitted at the hearing that Smith's decision to join SCS was a last-minute change of mind by Smith.

Additionally, Smith's communications with some of Lane Dermatology's patients who reached out to her after she accepted employment at SCS did not violate the non-solicitation provision. During these communications, Smith merely informed those patients where she was presently working and that she would not be returning to work at Lane Dermatology . We have interpreted the term "solicit" to involve a "personal petition and importunity addressed to a particular individual to do some particular thing," that is, the employee must make some "affirmative action" to reach out to customers. *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1) (455 SE2d 601) (1995); see also *Murphree v. Yancey Bros. Co.*, 311 Ga. App. 744, 748-749 (1) (716 SE2d 824) (2011) (non-solicitation provision prohibiting

8

former employee from "directly or indirectly soliciting, diverting, or taking away (or attempting to do so)" the former employer's customers only prohibited the former employee from "initiating affirmative action to compete with [his former employer] by contacting former customers"). Therefore, Lane Dermatology did not produce any direct evidence that Smith affirmatively reached out to any of its patients to solicit them to come to SCS or away from Lane Dermatology and thus this argument is without merit. See *Westpark Walk Owners, LLC*, supra, 288 Ga. App. at 635.

(b) Lane Dermatology further argues that the trial court erred in concluding that Smith did not breach the non-compete covenant because she was "providing services as a Physician's Assistant" within 15 miles of Lane Dermatology's office by displaying her name on SCS's Columbus nameplate. We are compelled to disagree.

First, the covenant in the contract provides that Smith cannot "provide services as a Physician's Assistant" within 15 miles of Lane Dermatology's Columbus office. The parties do not dispute that SCS's office in Newnan is outside of the 15-mile restricted territory as specified in the covenant and that Smith only works at SCS's Newnan office, not its Columbus office.

Second, as noted below in Division (1) (d), the trial court was entitled to conclude that Smith does not have the authority to remove the sign, and so any

9

injunctive relief against her to remove the sign would be of no effect. Thus, regardless of whether Smith was "providing services as a Physician's Assistant" through SCS's sign, the trial court did not abuse its discretion in denying a preliminary injunction based on Lane Dermatology's non-compete claim.

(c) Lane Dermatology also argues that it provided evidence that it has already lost patients to Smith and SCS, thereby establishing that it was suffering irreparable harm. At the hearing, Lane Dermatology admitted that it was unaware of a single patient switching to SCS and that it could not prove that it had suffered any financial injury. After the hearing, however, Lane Dermatology filed an affidavit from its office administrator, Renee Blanton. In the affidavit, Blanton stated that Lane Dermatology had received requests from SCS for files of patients who had seen Smith while she worked at Lane Dermatology. Blanton also stated that she had reviewed the files of patients who had been scheduled to see Smith upon her return to Lane Dermatology in May 2020, and that her review "[lead her] to believe that some of these patients may be going to see Smith at Defendant SCS." Although these facts are certainly suggestive, none of this evidence definitively shows that any of Lane Dermatology's patients are leaving *because of* Smith's actions. "Courts of equity will not exercise the power of injunctive relief to allay mere apprehensions of injury, but only where

10

the injury is imminent and irreparable and there is no adequate remedy at law."

(Citation and punctuation omitted.) *Lue v. Eady*, 297 Ga. 321, 329 (2) (c) (773 SE2d

679) (2015). Accordingly, we conclude that the trial court did not abuse its discretion

in concluding that Lane Dermatology failed to show that it was in danger of imminent

harm.

(d) Lane Dermatology argues that the trial court made a factual error as to

whether Smith had control over the nameplate and whether the trial court could order

its removal. It argues that the trial court erred by not treating SCS as Smith's "agent,"

thereby attributing SCS's action in displaying the nameplate to Smith because she

subsequently ratified SCS's conduct. Again we disagree.

Here, Smith testified that she was not aware that her name would be put on the

sign and that she was not involved in ordering the nameplate. Although Dr. Chastain

testified that he would have removed the nameplate if Smith had asked him, he also

testified that Smith herself did not have the authority to remove her name from the

nameplate. Therefore, the trial court was authorized to resolve this factual dispute

against Lane Dermatology and conclude that Smith did not have the authority to

remove the nameplate. See *Westpark Walk Owners, LLC*, supra, 288 Ga. App. at 635.

As for Lane Dermatology's agency argument, "[t]he relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for [her] or subsequently ratifies the acts of another *in [her] behalf.*" (Emphasis supplied.) OCGA § 10-6-1; *Ellis v. Fuller*, 282 Ga. App. 307, 309 (1) (638 SE2d 433) (2006). Lane Dermatology has not presented evidence that SCS changed its nameplate on Smith's behalf, as opposed to on its own behalf. "The doctrine of ratification is not applicable against a person as to an act of one who did not assume to act in [her] name or under authority from [her]." *Smith v. Pope*, 100 Ga. App. 369, 370 (6) (111 SE2d 155) (1959).

(e) Finally, to the extent that Lane Dermatology argues that the trial court was entitled to issue an injunction against SCS to remove the nameplate based on its tortious interference claim, we note that it appears that this issue has not yet been addressed below. The trial court's order, and the entire hearing below, solely concerned whether Lane Dermatology was entitled to an injunction to prevent Smith from further violating her restrictive covenants. In its order, the trial court made clear that the tortious interference claim against SCS was not fully addressed at the hearing. "[A]n appellate court is, among other things, a court for the correction of errors of law. An error of law has as its basis a specific ruling made by the trial court. There

12

having been no rulings by the trial court on the [issue] raised on appeal, there are no rulings to review for legal error." (Citations and punctuation omitted.) *City of Gainesville v. Dodd*, 275 Ga. 834, 837 (573 SE2d 369) (2002). Because the trial court has not yet addressed whether Lane Dermatology is entitled to an injunction against SCS, we decline to review this argument.

For all these reasons, we conclude that the trial court did not abuse its discretion when it denied Lane Dermatology's motion for a preliminary injunction.

*Case No. A21A0639*

2. In Smith's cross-appeal, she argues that the trial court erred when it denied her motion to strike Lane Dermatology's complaint under the anti-SLAPP statute. We conclude that the trial court correctly found that the issues in this case, to the extent they involve protected conduct, do not rise to the level of an "issue of public concern" that would trigger the anti-SLAPP requirements.

"We review an order granting or denying an anti-SLAPP motion de novo." (Citation omitted.) *Dellinger-Allen v. O'Brien*, 355 Ga. App. 811, 815 (1) (a) (846 SE2d 124) (2020).

> [T]he analysis of an anti-SLAPP motion involves two steps. First, the court must decide whether the party filing the anti-SLAPP motion

13

(usually, the defendant) has made a threshold showing that the challenged claim is one 'arising from' protected activity. If a court concludes that this threshold showing has been made, it must proceed to the second step of the analysis and decide whether the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(Citations omitted.) Id. at 814 (1) (a).

As we have previously articulated, a SLAPP is "a lawsuit intended to silence and intimidate critics or opponents by overwhelming them with the cost of a legal defense until they abandon that criticism or opposition." *Rogers v. Dupree*, 340 Ga. App. 811, 814 (2) (799 SE2d 1) (2017). SLAPPs are "meritless lawsuits brought not to vindicate legally cognizable rights, but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up their target's resources and driving up the costs of litigation." *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 257 (2) (830 SE2d 119) (2019). According to the General Assembly, Georgia's anti-SLAPP statute was enacted to

encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech. The General Assembly of Georgia further finds and declares that the valid exercise

14

of the constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process.

OCGA § 9-11-11.1 (a). To advance this goal, the anti-SLAPP statute covers

any claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern[.]

OCGA § 9-11-11.1 (b) (1). OCGA § 9-11-11.1 (c) further defines the coverage of the

anti-SLAPP statute and provides:

[T]he term "act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" shall include:

. . .

(3) Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern[.]

15

"A defendant meets her burden [of showing that the challenged claim "arose from" protected activity] by demonstrating that the act underlying the challenged claim 'could reasonably be construed as' fitting within one of the categories spelled out in OCGA § 9-11-11.1 (c)." (Citation omitted.) *Dellinger-Allen*, supra, 355 Ga. App. at 815 (1) (b).

When determining whether an issue is an "issue of public concern," the courts of California[2] have considered "whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occurred in the context of an ongoing controversy, dispute or discussion, or affected a community in a manner similar to that of a governmental entity." (Citations and punctuation omitted.) *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145-146 (II) (A) (439 P3d 1156) (2019). When determining whether challenged speech was made "in connection" with such an issue of public concern, California courts generally follow a two-step analysis. "First, [they] ask what public issue or issue of public interest the speech in question

---

[2] "In 2016, the General Assembly revised OCGA § 9-11-11.1 to substantially track California's anti-SLAPP procedure[.] . . . Thus, in interpreting our new OCGA § 9-11-11.1, we may look to California case law . . . for guidance, especially decisions . . . that employ the same kind of statutory analysis that we generally use." *Wilkes & McHugh, P.A.*, supra, 306 Ga. at 257-258 (2).

16

implicates—a question [they] answer by looking to the content of the speech. Second, [they] ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (Punctuation omitted.) Id. at 149-150 (III) (A). "[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (Citation omitted.) Id. at 150 (III) (A).

Viewed under this rubric, we agree with the trial court that SCS's nameplate listing Smith as a provider was not a statement made "in connection with an issue of public interest or concern" under OCGA § 9-11-11.1 (c) (3). Although Smith is apparently a well-regarded physician's assistant among her patients, there is no evidence that she is an individual that is particularly within the public eye or the subject of an ongoing media campaign. Crucially, Lane Dermatology has not presented any evidence that SCS's nameplate, or the issue of Smith's employment generally, affects more than the parties and a small group of the parties' customers. See, e.g., *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO*, 105 Cal. App. 4th 913, 924-930 (III) (B) (2003) (public statements alleging a supervisor mistreated employees and committed various crimes did not rise to a "matter of public interest" since the statements only involved the parties and eight

17

other employees). Compare *Rosser v. Clyatt*, 348 Ga. App. 40, 44 (2) (b) (821 SE2d 140) (2018) (statements concerning elections for the board of directors of Grady EMC were made in connection with an issue of public concern because the elections had become a topic of considerable public debate due to Grady's status as a major employer in the community and because the elections would affect thousands of members and employees) (physical precedent only). Additionally, the sign was made simply to provide information about Smith's employment status; it was not created to "encourage participation" in any particular debate about her status. See *Du Charme v. Intl. Brotherhood of Electrical Workers*, 110 Cal. App. 4th 107, 118-119 (III) (B) (2003) (statement on an organization's website that an officer had been removed for financial mismanagement was not made in connection with an issue of public concern when the statement was only made to a limited, specific group and was not connected to any discussion, debate, or controversy on the topic). We therefore conclude that the issue of Smith's name on SCS's nameplate, in and of itself, was not an issue of public interest or concern.

Smith argues that the nameplate and the information therein was connected to a broader public issue of ensuring that customers receive correct information about their medical providers, which, she argues, is a substantial issue of public concern.

18

Smith has not shown, however, how the specific issue of having Smith's name on SCS's nameplate was made "in connection with" a broader public debate about medical information beyond the customers of Lane Dermatology and SCS. See *All One God Faith, Inc. v. Organic & Sustainable Indus. Standards, Inc.*, 183 Cal. App. 4th 1186, 1203–1205 (II) (B) (1) (2010) (finding that statements concerning whether a trade association's "Organic Seal" was misleading did not contribute to a broader public debate on the meaning of the term "organic" but was only speech concerning the contents and qualities of a specific product); *Dyer v. Childress*, 147 Cal. App. 4th 1273, 1280 (3) (2007) (claims concerning the alleged misuse of a private person's character in a movie were not connected to any topics of widespread public interest addressed in the movie and did not go "beyond the parochial particulars" of the case); *Consumer Justice Center v. Trimedica Intl., Inc.*, 107 Cal. App. 4th 595, 601-602 (II) (C) (2003) (advertising claim about pills promising breast enlargement was not about "herbal supplements in general" but "the specific properties and efficacy of a particular product" and therefore did not invoke a public issue or an issue of public interest). In addition, the sign stating that Smith works for SCS does not particularly relate to any broader public concern about the accuracy of medical information or the efficacy of medical treatments generally. Compare *Wilbanks v. Wolk*, 121 Cal. App.

19

4th 883, 898-900 (III) (B) (2004) (person's statements to the public about a company's bad practices were made in connection with an issue of public concern because the statements were not simply an informational report of a company's practices but were made to warn the public). Smith has thus failed to show that this case involves speech made "in connection with" an issue of public interest or concern, and so the trial court correctly denied her motion to strike under the anti-SLAPP statute.

Therefore, for the reasons stated above, we affirm the trial court's denial of Lane Dermatology's motion for an interlocutory injunction, and we affirm the trial court's denial of Smith's motion to dismiss under the anti-SLAPP statute.

*Judgment affirmed in Case No. A21A0582. Judgment affirmed in Case No. A21A0639. Hodges and Pipkin, JJ., concur.*

20